CHARLES WATTS *vs.* THE UNITED STATES.

A murder, committed upon San Juan Island, in 1869, while the same was in the joint military occupancy of Great Britain and the United States, pursuant to the convention entered into between these powers, pending

the final adjustment of the international boundary line, is not an offense committed at a place within the sole and exclusive jurisdiction of the United States as contemplated by section 3, of the act of Congress of April 30, 1790. (1 Statutes, 113.)

The said sole and exclusive jurisdiction, named, is not jurisdiction exclusive of a State as contradistinguished from that of a Territory, but rather national jurisdiction, as exclusive of the jurisdiction of local, State or Territorial government.

The above mentioned Convention was not a treaty, within the meaning of the constitution; but the power to enter into such a convention to meet a national exigency, is a necessary incident to national government, and in carrying it into effect, an existing statute must yield to such extent as may be required by the political department of the government.

The establishment of a Territorial government, in Washington Territory, though subsidiary to national authority, was the implanting of a new jurisdiction over that Territory, which in relation to its people was intended, for the time being, to serve in lieu of, or a purpose like to that of a State government.

The mere fact that the executive department of the United States, had taken possession of San Juan Island, and excluded local officers appointed by the Territorial government from exercising their functions there, did not displace the Territorial jurisdiction, that by virtue of the organic act extended over it, but merely suspended the execution of the Territorial laws for the time being therein.

JACOBS, Chief Justice, dissenting, held that as a result of the convention entered into, between Great Britain and the United States, all Territorial laws had been excluded from this Island, and hence it was a place within the exclusive jurisdiction of the United States.

That, in order to honestly and faithfully fulfill its convention-stipulations, it became both proper and necessary for the general government to segregate this Island from its former Territorial jurisdiction.

Error to the Third Judicial District.

In this case Watts was indicted by the grand jury of the United States, for the crime of murder committed on San Juan Island, within the limits of the Third Judicial District, in the month of June, 1869. Both the defendant and deceased were citizens of the United States.

At the time of the homicide, San Juan Island was claimed both by Great Britain and the United States. Prior to this time, and in 1859, these governments entered into a convention by which it was provided, that until it was finally determined to

37

which of these powers the Island did belong, it should be held in their joint military occupation. At the time of the homicide both British and United States soldiers were in possession of the Island, and officers under the Territorial government in the performance of their official functions were excluded.

The military arrested the defendant and turned him over to the civil authorities to be dealt with for his crime.

At the September term of the district court, holding terms at Port Townsend, he was tried, found guilty of murder and sentenced to be executed.

On the writ of error sued out from this court, numerous errors were assigned, but the single one of jurisdiction in the United States, was passed upon by the court.

*Frank Clark* and *J. E. Wyche* for plaintiff in error.

*Leander Holmes*, U. S. Attorney, for defendant in error.

Opinion by GREENE, Associate Justice.

This is a cause involving the life of one of the citizens of the nation, and, to pass judgment, we are called to solve at least one question of difficulty, a jurisdictional question novel and perplexing, and not only of serious individual but of constitutional and international concern. Before touching the merits of the case however we feel compelled briefly to animadvert upon the manner in which it is presented by the plaintiff in error. The whole record is carelessly made. An original demurrer from the files or the Court below, fastened into the transcript, is most improperly inserted, and cannot be regarded as part of the transcript or retained here but must go back to the district clerk's office where it belongs.

Some of the matters assigned for error are sham or impertinent and have no foundation in the record. Others are twice assigned. It does not appear of record (as stated in the fourth matter assigned for error) that plaintiff in error ever applied to the Court below to have the jury discharged. It not only does not appear, that the Court below refused (as stated in the fourteenth matter assigned for error) to give the fifth and seventh instructions asked by defendant's counsel, but on the contrary

it does appear that those instructions were actually given as asked. It does not appear, that any ninth instruction (as mentioned in the fifteenth matter assigned for error) was asked or refused. The remainder of the matters fourteenthly and fifteenthly assigned for error is redundant, being mere repetition of what is in previous paragraphs sufficiently assigned. The thirteenth specification of supposed error has no color of ground in the record.

This cause presents three general questions:

1. Did the Court below have jurisdiction?

2. Was the prisoner entitled to draw a jury from a panel filled to the full number of jurymen ordered in the venire?

3. Does the evidence sustain the verdict?

But, as is evident, the decision of the second and third question is necessary only in case of an affirmative answer to the first.

Under the organic act of this Territory, the District courts "have and exercise the same jurisdiction in all cases arising under the constitution and laws of the United States, as is vested in the Circuit and District courts of the United States, and also of all cases arising under the laws of said Territory and otherwise." Act of March 2, 1853, Sec. 9, 10 Stat., 175.

At the time of the passage of that act, the district courts of the United States had, and they still have, by virtue of the judiciary act of 1789, as amended by the act of 1842, "cognizance of all crimes and offenses * * * cognizable under the authority of the United States, committed within their respective districts * * * except, offenses punishable capitally." Act 24 Sept., 1789, Sec. 9, 1 Stat., 76; Aug. 23, 1842, Sec. 3, 5 Stat., 517.

The same statute of 1789 gives to the circuit courts of the United States an "exclusive cognizance (still subsisting) of all crimes and offenses cognizable under the authority of the United States except, where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the district courts of the crimes and offenses cognizable therein." *Ibid*, Sec. 11, 1 Stat., 78.

From these two statutes the organic act and the judiciary act, as amended, collated, it appears that if, of the supposed crime of the plaintiff, in error, it can be predicated, first, that it was a crime or offense cognizable under the authority of the United States, and, second, that it was committed within the Third Judicial District of Washington Territory, then the district court of that district had jurisdiction of it, as an offense against the United States. And, on the other hand, it is true, there being no law extending the jurisdiction of the district court in the premises, that if the supposed crime was not cognizable under the authority of the United States, or was not committed within the district of the court, then the court lacked jurisdiction of it, as an offense against the United States, and all its proceedings were and are void.

The crime of which the plaintiff in error stands indicted, is willful murder, and jurisdiction is asserted. Sec. 3, of the act of Congress, approved April 30, 1790, 1 Stat., 113.

That act provides, that "If any person or persons shall, within any fort, arsenal, dockyard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of willful murder, such person or persons, on being thereof convicted, shall suffer death."

The indictment charges the crime to have been committed at "San Juan Island, and under the sole and exclusive jurisdiction of the United States." The whole prosecution proceeds upon the hypothesis, that the Island of San Juan is within the sole and exclusive jurisdiction of the federal government. If the jurisdiction of the federal government be not "sole and exclusive," then confessedly there was no jurisdiction, at the suit of the United States, in the Court below of the crime of which the plaintiff in error is charged.

There has been for twenty-five years a dispute between the governments of the United States and Great Britain, as to whether the boundary line between the United States and the British possessions passes along Rosario Strait and east of the

Island of San Juan or along the Canal de Haro west of it.    If along Haro, then San Juan falls within United States limits; if along Rosario, within the British possessions.    Since 1859 the Island has been held by both nations in joint military occupation.    By mutual understanding between them, by a very loose and ill-defined convention (if it can be called a convention), not by any formal treaty, in consideration of a certain attitude and forbearance assumed and exercised by the British government on its part, the United States on their part have, among other things, (and apparently so far only as appeared to them necessary, in order to prevent troubles growing out of questions of jurisdiction) excluded local officers appointed by the Territorial government, from exercising their functions on the Island pending the dispute.    And in such a delicate posture of affairs, it was both expedient and necessary, in order to prevent conflicts of authority, embarrassing complications, and perhaps hostilities not readily to be quelled, that the general government, which alone, as against Great Britain, could claim the soil of the Island and eminent domain therein, and from which the Territorial authorities derived all their sway, coming as a principal upon a pressing exigency to take the management into its own hands, should assume in some measure control exclusive of the Territorial government, not only of the dispute itself, but of the land which it concerned.

This, acting through the Departments of State and War, the government of the United States did.    Congress, the legislative branch of the government, which must be presumed to have been fully apprised by the President of all the diplomatic relations and acts of the nation, has for a long term of years tacitly acquiesced.    A provisional convention, to all intents and purposes, and of the character indicated, has for many years been operative upon the Island of San Juan.    Whatever was to be done under it, by either government, has been done upon the faith of it; each nation maintains its present attitude until a permanent settlement can be made.

This convention respecting the common territory, in which it had, as respecting the common interests, a vested right of

eminent domain, we think the government of the United States had power to make. No question of state rights or state sovereignty intervenes. The power to make and enforce such a temporary convention respecting its own territory is a necessary incident to every national government, and inheres where the executive power is vested. Such conventions are not treaties within the meaning of the constitution, and, as treaties, supreme law of the land, conclusive on the courts, but they are provisional arrangements, rendered necessary by national differences involving the faith of the nation and entitled to the respect of the courts. They are not a casting of the national will into the firm and permanent condition of law, and yet in some sort they are for the occasion an expression of the will of the people through their political organ, touching the matters affected; and to avoid unhappy collision between the political and judicial branches of the government, both which are in theory inseparably all one, such an expression to a reasonable limit should be followed by the courts and not opposed, though extending to the temporary restraint or modification of the operation of an existing statutes. Just as here, we think, this particular convention respecting San Juan should be allowed to modify for the time being the operation of the organic act of this Territory, so far forth as to exclude to the extent demanded by the political branch of the government of the United States, in the interest of peace, all territorial interference for the government of that island. For the general welfare a few are prejudiced.

There is another view, also, in which we think the political authority of the United States are justified in their action respecting San Juan Island.

Congress in establishing temporarily a territorial government intended to establish one strictly subsidiary to the authority of the United States, not one which should in any manner limit, hinder, fetter, or interfere with the free, legitimate and necessary action of the general government or of any of its departments. The central government holds its acquired territory in trust for the states in common. To resist invasion of

that territory; to preserve it in full and undiminished area; to assert dominion over it against every foreign power; to settle and.adjust, in the most amicable and inexpensive manner, consistent with the nation's dignity, all disputes with foreign powers concerning it; to secure it, when in controversy, from being unnecessarily the field of hostile collision between local authorities and foreign agents; and, if possible, to prevent upon it the precipitation of a war dreadful to all the states; these are some of the plainest duties of the general government to its *cestui que trust.* The trust is prior in origin, and stronger in obligation upon every department and officer of the general government, than any contervailing law of congress can be, for congress itself is subject to it, and its legislation is qualified by it. The executive department of the United States, in taking possession of San Juan Island exclusive of the local territorial authorities, under the circumstances existing at the time and not yet altered, executed reasonably and fitly as the appropriate governmental organ the duty of the government as trustee towards the states. And the organization of Washington Territory being the creature of the national government, not merely subordinate but subject to it, cannot be supposed to dissent from, much less resist this reasonable and obligatory exercise of power.

But it is not to be inferred, because of the international dispute, nor because a few local territorial officers are for a time restrained from the exercise of their functions on the Island, that the Island is thereby removed from the dominion of law. It still is a part of the United States of America, still a part of Washington Territory, still a part of the Third Judicial District.

This Court cannot recognize as of any validity the adverse claim of any foreign power upon the Island.

Whether or not any tract of land is within the geographical limits belonging to the United States is a political and not a judicial question. *Foster vs. Neilson,* 2 Peters, 252, 307. And whatever the political department of the government shall recognize as within the limits of the United States, the judicial department is also bound to recognize and to administer in it the laws of the United States, so far as they apply, and to main-

tain in the Territory the authority and right of the government, and also the personal rights, and rights of property of individual citizens." *Scott vs. Sandford*, 19 How., 393, 447; 2 Vattel, ch. 7, Sec. 84.

Since, then, the United States claims San Juan Island, we must treat it as under the general laws of the United States, and as under the laws providing for the government of this part of the territory of the United States, and as entitled to the peace and security afforded by law in matters criminal as well as civil.

The organic act of the Territory is operative upon the Island. The northwestern geographical bounds of the territory, and of the third judicial district are the same as if there were no dispute of boundary, no restraint of local officers. Those bounds are identical, in the eye of the courts of the United States, with the boundary line along the canal de Haro, claimed by the political department of the general government to be the true political boundary.

Yet, in order that the crime of which the defendant is charged should be within the jurisdiction of the Court below, it was not only necessary that it be committed within the United States, but in a place within the "sole and exclusive jurisdiction of the United States." This phrase "sole and exclusive" means exclusive of any other domestic jurisdiction, and has no reference to foreign authority.

The counsel for the United States, admitting this, has argued nevertheless, and with some plausibility that the phrase means exclusive of state, not territorial jurisdiction, and that all the territories, and this Territory in particular, and every part thereof, are in the sense of this law, "within the sole and exclusive jurisdiction or the United States."

We cannot concur in his views. The territorial governments are established preliminary to state organizations. They are republican in design, and intended, so far as the interests of the states of the Union in the common territory will permit, to afford to the people of the Territory the liberty and satisfaction

of self-government, and a voice in the councils of the nation. In all important particulars they are, as closely as may be, assimilated to the common character of the governments of the states.

The organization of Washington Territory is essentially the same as that of each of the other Territories. Like each of the states, its government is divided among three departments, executive, legislative and judicial. The legislative department, as in all the states, consists of an upper and a lower house, distinguished by the number of members, and the different lengths of their respective terms of office, and has confided to it general legislative power.

The establishment of the Territorial government over the area of Washington Territory was the establishment of a jurisdiction there. That jurisdiction was analogous to that of a state and included general police power; for it extended to "all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States," (Organic Act, Sec. 6.) and as appears from the pardoning clause of the second section of the Organic Act, was assumed to embrace in such legislation the definitions of offenses and the imposition of punishment. Police power is, indeed, essential to any governmental organization, and inheres in the very idea of government.

We would not be understood to say, that, by the act establishing the Territorial government, the United States parted with their judisdiction. They still retained the power to legislate over the Territory on all matters whatever. They simply by that act implanted here a new jurisdiction. After that act, their jurisdiction here as to all matters confided to the Territorial authorities was no longer sole and exclusive.

The intent of Congress in passing the statute against murder was, not to make murder punishable, nor to make the punishment of murder uniform in all places within its jurisdiction, else the statute would not have contained the expression "sole and exclusive." The intent seems rather to have been to prevent that detestable crime from finding harbor and impunity in

38

places where no other law than that of the United States could reach to punish. In the presence of any other suitable jurisdiction, the law, by intent of the framer, would fall inoperative.

The government of this Territory possesses such a suitable jurisdiction. It is a jurisdiction intended to serve for the time being in lieu of a state jurisdiction; intended to bear a like relation to the people, and to have, except where expressly or by necessary implication restrained, like scope. To bound or lessen this jurisdiction there must be a real, irreconcilable inconsistency with United States law.

There was, on the 1st July, 1862, a law passed by Congress, the phraseology of the first section of which might, to a cursory inspection, seem at variance with some of the views we have expressed, but from which a closer criticism would gather an argument in their support. The section defines and forbids bigamy, and was passed, I suppose, more particularly for the benefit of a sister Territory. The language alluded to is as follows: "Every person, having a husband or wife living, who shall marry any other person whether married or single, in a Territory of the United States, or other place over which the United States had exclusive jurisdiction, shall," etc. At first glance it might seem as if the places over which the United States have exclusive jurisdiction occurred to the legislative mind as of two classes (1) Territories and (2) other places; a classification frivolous as a distributive but good as an exhaustive one. It is certainly possible that under this impression the law was framed. But, should one select the current of thought which most probably obtained in the legislative mind and found expression in the language quoted he would reach a different conclusion. Uppermost in the mind of the legislator, was the fact, that occasioned the legislation, namely, that the acts to be prohibited as criminal were specially prevalent in a certain one of the Territories. The law, therefore, should be made to cover that Territory. But if covering that Territory alone, it might perhaps be evaded, or might seem too pointed or sectional, or might not meet possible future wants elsewhere. So it was made to embrace all the Territories. At this stage it may rea-

sonably be supposed to have come to mind, that there was on the United States statute book actually no statute defining bigamy, and, except for the District of Columbia, none against it. Hence the description of territory to be embraced was extended so as to include the other places in need of legislation; and as these other places were within the exclusive jurisdiction of the United States, and as that was the only generic description that could be given of them they were so described.

One aim of Congress in the act as passed was to have a law, in form, general. Any design to intimate that each of the Territories was to be construed within the exclusive jurisdiction of the United States, was, it may be confidently asserted, entirely absent from its thought. Its mind was intent on making a general law, not on settling a question of construction. But had an impression of the sort been present, and the design absent, Congress would hardly have used the words " in a Territory of the United States or other place," etc., but rather merely the all embracing words " in any place," etc., and thus have avoided the use of what, to a mind under such an impression, would be superfluous words, " Territory of the United States or other." If, on the contrary, the impression had been present, (and it is not improbable that it was) that a Territory was not within the exclusive jurisdiction of the United States, then every word used in the statute would have been necessary in order to make it embrace the Territories, and the classification into Territories and other places would have exhibited no frivolous aspect. The construction that makes no verbiage is certainly preferable.

We are of opinion, that the jurisdiction of the United States is not "sole and exclusive" on the Island of San Juan, within the meaning of the act, April 30, 1790; that the statute of the Territory against murder, at the time laid in this indictment, was, and still is, in force there and that the district court of the Third Judicial District in the exercise of its jurisdiction over all cases arising under the laws of the Territory, had authority to try and punish any person who had committed murder on that Island. So far forth as the exercise of such jurisdiction might be inconsistent with the understanding

between the United States and Great Britain respecting the Island and offenses upon it, it might be the duty of that court to decline to exercise it; but, in the case of the defendant below, there was not only no lack of jurisdiction of the offense, at the suit of the Territory and under Territorial law, but there was no good reason why that jurisdiction should not be exercised by the court. By the international arrangement, each nation was to exercise jurisdiction over its own citizens on the Island. The defendant below was a citizen of the United States, and was by the United States military commander on the Island, turned over to civil authority for punishment. The prosecution below should have been at the suit of the Territory, and not at the suit of the United States.

The evidence plainly shows that the defendant is guilty of an offense against the Territory. Such being the views of the court on the question of jurisdiction, it is unnecessary to discuss any other question in the case.

Let the judgment of the Court below be reversed and the prisoner be returned to the sheriff of the proper county there to abide the order of the District Court thereof.

The original demurrer should be detached from the transcript sent by the clerk to the clerk of the Court below, and its place be supplied by a copy certified under the seal of this court.

KENNEDY, Associate Justice, concurring:

I concur with my Brother Greene in the conclusion that " the prosecution below should have been at the suit of the Territory, and not at the suit of the United States," and that the judgment therein, must therefore be reversed.

I coincide with the reasons assigned by him in support of that position, but express no opinion on the various independent propositions not necessary to establish it, contained in the decision.

JAMES K. KENNEDY, *Associate Justice.*

Dissenting Opinion by JACOBS, Chief Justice.

As I cannot assent to the conclusion reached by the major-

ity of the Court in this case, I will state as briefly as possible the conclusion of my own mind upon the question of jurisdiction involved in the case, with my reasons therefor.

I have come to the conclusion that the United States, side of the court had jurisdiction and for the following reasons:

1. We all agree that the phrase "sole and exclusive jurisdiction" as used in the crime act of A. D., 1790, 1 Stat., 113, has no reference to a claim of jurisdiction made by any foreign power, but to state and federal jurisdiction, or as we are situated, to federal as contradistinguished from Territorial jurisdiction. We also agree that it is the duty of the Judiciary to extend the jurisdiction of the laws of the United States as far as the political department of the government extends the Territorial area.

2. In my judgment it is the duty of the courts to construe all such conventions as that entered into between the governments of the United States and Great Britain, with reference to the Island of San Juan, so as to avert the evil apprehended, and sought to be prevented.

When this convention was entered into there was imminent danger of a conflict of arms. That danger arose from two causes—the action of the military commanders of this department and the enforcement of the laws of Washington Territory over the disputed domain. The first danger was removed by a change of commanders. The second by the exclusion of the laws of the Territory, and that exclusion has been enforced by the military power of the government ever since.

3. Was it the intention then of the high contracting parties to exclude all law from San Juan Island, and to make it a secure asylum for thieves and murderers? I think not. Possibly there might be some ground for the recognition of the distinction between acts *malam in re*, and *malam prohibita*, acts which under every law, human and divine, are criminal, and those acts which are only criminal by virtue of some positive statute making them such. I infer that two civilized nations would not directly or indirectly concur to create any such asylum.

It was the design then that some laws should exist and be enforced on that Island. That it was the design of our Government to exclude the laws of the Territory is manifest by the proceedings of the convention and the action of our government from the date of the convention down to the present time. It was so understood by the military department; acquiesced in by the other departments of the government, and recognized as a fact by the courts of the Territory, and by the legislature, as is evidenced by the release of the county of Whatcom, within whose limits the Island was included by a prior act of the legislature, from the payment of all costs for the prosecution of persons committing crime on said Island.

Whatever jurisdiction might have been claimed by the Territory prior to the last cited act, was virtually abandoned by it.

The exclusion of the Territorial laws since the date of the convention, has been open, manifest and palpable, and I believe rightful. Then, if I am correct in my conclusions, no other laws were in force on the Island for the punishment of persons guilty of murder, (not connected with the military,) but the laws of the United States. In fact it would follow as a logical sequence that if the Territorial laws were excluded it would be a place "under the sole and exclusive jurisdiction of the United States," hence the laws of the United States would be operative there.

I can see many cogent reasons why it was desirable to exclude Territorial laws and Territorial officers from that Island. The Territorial legislature represented but a small fraction of the American people and was far removed from the power which was responsible for a state of peace or war, and before measures could be disapproved by Congress a conflict might be precipitated. Territorial officers were not responsible, directly at least, to the Supreme power. It had no control over their official conduct. All will agree that such control ought to be directly with the responsible power. That could only exist legitimately, but by the exclusion of the local jurisdiction and the operation of the national jurisdiction modified by express convention or necessary implication.

It might be very competent and very proper in the accomplishment of the object had in view, for the treaty making power to suspend the operations of all laws for the punishment of offenders save in the cases where the acts were crimes, by the universal judgment of mankind. The power to suspend or modify must exist somewhere, or in case of disputed jurisdiction there could be no treaty or conventions.

All such conventions are founded on the mutual concessions of the high contracting parties. After the convention had been signed, the supreme power in our government, in order to secure its honest and faithful execution, took possession of the disputed Territory, segregated it from its former local jurisdiction, and administers, modifies or suspends its own laws by its own military or judicial agents. The Supreme power acts through its own functions and not through that of an inferior jurisdiction. It administers its own laws so far as such administration is not in conflict with the convention. Its power is ample and it need not borrow from the inferior jurisdiction.

It cannot be argued successfully that because San Juan Island is within the limits of Washington Territory, that, therefore, it can only be subject to its laws. Puget Sound, Admiralty Inlet, and one-half of the straits of Fuca are within the Territorial boundaries, but still many of the criminal laws of the United States extend over them. Neither can the joint possession of the United States and Great Britain affect the question.

The high seas are in the joint possession of all the nations, and yet every nation punishes its own subjects for crimes committed there. Watts is an American citizen and the victim of his violence was also.

4. I am unable to convince myself that, if one general law of the Territory went to that Island, but what all general laws went there. That they were not and are not permitted to go there is a fact too palpable for argument. The alternative then is presented, either that their exclusion by force has been rightful, or that the military department has been guilty of a gross usurpation.

The latter branch of the alternative ought not to be received without the clearest and most indubitable proof of its correctness. I am not contending for the doctrine that a military order is absolutely conclusive upon the Courts, but it is always entitled to respectful consideration and will be presumed lawful until the contrary is shown. Especially should such be the case when the order emanates from the highest functionary of the military department, and has been long sanctioned, at least by the acquiescence of every other department, of government.

To have permitted all the laws of the Territorial legislature to have gone to that Island would have resulted in the nullification of the convention. It would in fact have given the Territorial legislature a veto on the treaty-making power of the government. Could this convention have stood for a day with the extension of the taxing power of this Territory over that Island. Every one knows that it could not. If the Territorial jurisdiction extended there, it had a right to tax the property of the inhabitants, thereof, for Territorial and other legitimate purposes. Taxes are not levied upon citizens, only, but inhabitants, property-holders, resident within the jurisdiction. The rightful exercise of such a power would have been decisive of the controversy, or rather it would have been exclusive of any rightful claim to controversy. Its attempted exercise would have been resisted with all the power of Great Britain. Reverse the circumstances and let British Columbia attempt to extend its taxing power over that Island and our government would resist the insult with all its military power.

On what principle could a part of the general laws of the Territory go to that Island and a part not? It is of the very essence of general laws, at least, that they should be uniform and universal. If the Territorial jurisdiction extended at all it is complete and entire. It reaches all rightful subjects of legislation, and is supreme within those limits.

For the above reasons, I am of the opinion that Watts was rightfully indicted under Sec. 4, of the crime act of 1790, which reads as follows. "If a person or persons, within any fort, ar-

senal, dockyard, magazine, or in any other place, or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of willful murder, such person or persons on being thereof convicted, shall suffer death."

But if there be a doubt as to whether San Juan Island was within the Third Judicial District or not, then the last clause of Sec. 28, of the crime act of 1790, would apply, for Watts was first brought into the Third Judicial District and delivered to the Marshal of the Territory by the order of the Secretary of War.