**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Clifton S. COREY, Defendant–**
**Appellant.**

**No. 99–10232.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 14, 2000

Filed Nov. 20, 2000

---

**11.** There is no INS regulation interpreting   § 1401 that addresses the issue at bench.

Samuel P. King, Jr., Honolulu, Hawaii, argued the cause for the defendant-appellant.

Loretta A. Matsunaga, Assistant United States Attorney, Honolulu, Hawaii, argued the cause for the plaintiff-appellee.

Before: KOZINSKI, KLEINFELD and McKEOWN, Circuit Judges.

Opinion by Judge KOZINSKI; Dissent by Judge McKEOWN.

KOZINSKI, Circuit Judge.

We consider whether the federal courts have jurisdiction over a criminal case charging a United States citizen with offenses committed at United States installations abroad.

## I

Clifton S. Corey, a United States citizen, lived abroad with his family while working for the U.S. Air Force as a civilian postmaster. From 1993 to 1996, Corey ran the post office at the American Embassy in Manila, the Philippines, and for several years before, he managed the office at the U.S. Air Force Base at Yokota, Japan. In 1996, Corey's stepdaughter, Anna, told her doctor that her stepfather had forced her to engage in sexual intercourse with him for the previous five years, starting when she was fifteen. After an investigation, the government charged Corey with aggravated sexual abuse and sexual abuse in violation of 18 U.S.C. § 2241(a) and 2242(1).[1] The first trial ended in a hung jury but, after a second trial, Corey was convicted on eight of eleven counts and sentenced to 262 months in prison. On appeal, he challenges the district court's jurisdiction and also raises a variety of trial errors. We address the jurisdictional issue in this opinion and the remaining issues in a memorandum disposition filed concurrently.

1. Subsections 2241(a) and 2242(1) provide respectively that:
   Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly causes another person to engage in a sexual act—
   (1) by using force against that person; or
   (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both....
   18 U.S.C. § 2241(a).
   Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly—

## II

Prior to trial, the district court granted the government's motion to preclude Corey from contesting jurisdiction.[2] Corey argued then, as he does now, that crimes committed on foreign soil fall outside the reach of 18 U.S.C. §§ 2241 and 2242. Both provisions proscribe sexual assault within the "special maritime and territorial jurisdiction of the United States," a phrase defined by 18 U.S.C. § 7. While Corey lived in Japan, he and his family resided on the Yokota Air Force Base. In the Philippines, they lived at Lopez Court, a private apartment building rented by our embassy for the use of its employees. The government charges that the sexual abuse occurred in each of these residences. Corey argues that neither residence falls within the special jurisdiction of the United States.

The "special maritime and territorial jurisdiction of the United States" includes:

Any lands reserved or acquired for the use of the United States, and under the exclusive , or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 7(3). This provision tracks its origin to 1790, yet, at the time this case was brought, only two courts had ad-

(1) causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping)[,] ...

. . . . .

or attempts to do so, shall be fined under this title, imprisoned not more than 20 years, or both.
18 U.S.C. § 2242(1).

2. The government filed this somewhat unusual motion in order to present the jurisdictional question to the district court prior to trial.

dressed whether it applied to lands within the territory of a foreign nation. *See United States v. Erdos*, 474 F.2d 157 (4th Cir.1973); *Witten v. Pitman*, 613 F.Supp. 63, 65–66 (S.D.Fla.1985); *see also Talbott v. United States ex rel. Toth*, 215 F.2d 22, 27 (D.C.Cir.1954), *rev'd sub nom. United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955). Two other courts have since ruled on the issue. *See United States v. Gatlin*, 216 F.3d 207 (2d Cir.2000); *United States v. Bin Laden*, 92 F.Supp.2d 189 (S.D.N.Y.2000).

We review de novo the district court's assertion of jurisdiction. *See United States v. Vasquez–Velasco*, 15 F.3d 833, 838–39 (9th Cir.1994).

### III

▬ [1] **A.** Congress may enforce its laws beyond the territorial boundaries of the United States. *See EEOC v. Arabian Am. Oil Co.* ("*Aramco*"), 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991); *Vasquez–Velasco*, 15 F.3d at 839 ("Generally there is no constitutional bar to the extraterritorial application of United States penal laws." (citations omitted)). Whether Congress has in fact exercised such power is a question of statutory construction, normally subject to the rule " 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 (quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) ("Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested.").

For most legislation, the presumption against extraterritoriality makes perfect sense. First, "Congress generally legislates with domestic concerns in mind," *Smith v. United States*, 507 U.S. 197, 204 n. 5, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993), so courts can infer from congressional silence that the legislature meant to regulate only activities within the nation's

borders. Second, the rule ensures that we do not precipitate "unintended clashes between our laws and those of other nations which could result in international discord." *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227. The Supreme Court has invoked this territorial presumption in numerous cases involving the scope of broad regulatory statutes. *See, e.g., Sale*, 509 U.S. at 173, 113 S.Ct. 2549 (Immigration and Nationality Act); *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 (Title VII); *Filardo*, 336 U.S. at 285, 69 S.Ct. 575 (federal overtime law); *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826 (1909) (Sherman Act). In all of these cases, the Court held that Congress expected that its regulations would end at the national borders.

▬ The territorial presumption is thus based on the common-sense inference that, where Congress does not indicate otherwise, legislation dealing with domestic matters is not meant to extend beyond the nation's borders. But the presumption does not apply where the legislation implicates concerns that are not inherently domestic. For instance, in *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922), the Supreme Court held that the territorial presumption does not govern the interpretation of criminal statutes that, by their nature, implicate the legitimate interests of the United States abroad. *Bowman* concerned fraud committed on a U.S. vessel outside the territorial waters of the United States. Although the statute there did not contain an extraterritoriality provision, the Court concluded that it covered the conduct in question. *See also Vasquez–Velasco*, 15 F.3d at 839 n. 4 (applying *Bowman* to violent crimes associated with international drug trafficking); *United States v. Felix–Gutierrez*, 940 F.2d 1200, 1204 (9th Cir.1991) (applying *Bowman* to accessory after the fact to the murder of a DEA agent in Mexico). Thus, courts do not apply the territorial presumption where it is not a reliable guide to congressional intent.

When Congress is considering the scope of federal jurisdiction, its attention is focused precisely on how far U.S. law should reach. Unlike ordinary domestic statutes, jurisdictional statutes inherently present the question of how far Congress wishes U.S. law to extend. There is therefore no reason to presume that Congress did, or did not, mean to act extraterritorially. Rather, we agree with *Bin Laden* that "[w]hen presented with the task of interpreting jurisdictional statutes such as [subsection] 7(3), courts should simply employ the standard tools of statutory interpretation...." 92 F.Supp.2d at 206 n. 32.

Applying the territorial presumption to subsection 7(3) would be a mistake for another reason: Land subject to subsection 7(3) is not "extraterritorial," as the Supreme Court has defined the term. In *Aramco,* the Court described territorial jurisdiction as including "places over which the United States has sovereignty or has some measure of legislative control." *Aramco,* 499 U.S. at 248, 111 S.Ct. 1227 (internal quotation marks omitted). Subsection 7(3) does not purport to regulate conduct within territory over which the United States lacks "some measure of legislative control"; by its terms, it extends only to areas within the concurrent or exclusive jurisdiction of the United States. *See Environmental Defense Fund v. Massey,* 986 F.2d 528, 533 (D.C.Cir.1993) ("[W]here the U.S. has some real measure of legislative control over the region at issue, the presumption against extraterritoriality is much weaker."). Thus, even more than ordinary jurisdictional statutes, subsection 7(3) is a poor candidate for the territorial presumption.

Because foreign lands covered by subsection 7(3) are, by definition, under the legislative control of the United States, the second policy supporting the territorial presumption-the desire to avoid "unintended clashes" with foreign powers, *see Aramco,* 499 U.S. at 248, 111 S.Ct. 1227—is also inapplicable. Legislative jurisdiction over the territory of a foreign power can only be acquired through that nation's consent—or by conquest. *See, e.g., In re Ross,* 140 U.S. 453, 464, 11 S.Ct. 897, 35 L.Ed. 581 (1891) ("When ... the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree...."). Either way, subsection 7(3) will apply only where the foreign sovereign does not or cannot object to the exercise of such jurisdiction. This case illustrates the point: Neither the Philippines nor Japan has protested the assertion of jurisdiction over Corey. Quite the contrary, both countries have abjured any interest in prosecuting Corey, no doubt recognizing that the case involves internal U.S. matters.

But, even if the presumption were applicable, the text of section 7 would clearly rebut it. The language and structure of the statute reflect a legislative purpose to reach places that lie well beyond U.S. borders. The *special* maritime and territorial jurisdiction of the United States extends by definition beyond *ordinary* land and seas. Taken as a whole, 18 U.S.C. § 7 extends the jurisdiction of the federal criminal laws to areas where American citizens and property need protection, yet no other government effectively safeguards those interests. Congress unmistakably had foreign locales in mind when it set about defining that jurisdiction. Put subsection 7(3) aside for the moment. *Every* other subsection mentions spaces outside the fifty states. Section 7 reaches vessels sailing on the high seas, subsection 7(1), or on international waterways, subsection 7(2); islands prized for their rich bird droppings, subsection 7(4); airplanes flying the friendly skies, subsection 7(5); NASA spaceships rocketing towards Mars, subsection 7(6); Antarctica, subsection 7(7); and foreign ships coming to America, subsection 7(8). Section 7 as a whole extends the jurisdiction of the United States to the ends of the earth (and beyond). We construe subsection 7(3) against the extraterritorial backdrop of its neighbors.

The history of the statute, discussed below, *see* pp. 1173–76 *infra*, confirms that Congress intended precisely this interpretation. We conclude therefore that subsection 7(3) applies to Americans in all territory, wherever situated, that is acquired for the use of the United States and under the exclusive or concurrent jurisdiction of the federal government.

**B.** Our conclusion that subsection 7(3) applies to territory outside the borders of the fifty states agrees with that of the Fourth Circuit. *See United States v. Erdos*, 474 F.2d 157 (4th Cir.1973) (holding that subsection 7(3) grants territorial jurisdiction over the American embassy in Equatorial Guinea). Two circuits in addition to our own have previously repeated *Erdos*'s holding, albeit in dicta. *See Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1342 (2d Cir.1992) (noting that section 7 would permit U.S. criminal jurisdiction over the commission of crimes at Guantanamo Bay), *vacated on other grounds sub nom., Sale*, 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716; *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841–42 & n. 11 (D.C.Cir.1984) (recognizing but distinguishing *Erdos*); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588–89 (9th Cir.1983) (same); *see also Agee v. Muskie*, 629 F.2d 80, 111 (D.C.Cir.1980) (MacKinnon, J., dissenting) (relying on *Erdos* and finding that "[b]y virtue of [subsection 7(3)] the United States Embassy in Tehran, Iran is within the 'special' territorial jurisdiction of the United States"), *rev'd on other grounds sub. nom, Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).

Recently, however, in a case almost identical to ours, the Second Circuit held that subsection 7(3) applies only to lands acquired within the territorial borders of the United States. *See United States v. Gatlin*, 216 F.3d 207 (2d Cir.2000). The defendant in *Gatlin*, an American civilian on a military base in Germany, impregnated his thirteen-year-old stepdaughter while his wife was on duty in Bosnia. Federal prosecutors charged Gatlin with engaging in sexual acts with a minor within the special territorial jurisdiction of the United States. The district court ruled it had jurisdiction and accepted Gatlin's conditional guilty plea. On appeal, the Second Circuit concluded that the territorial presumption, fortified by a reading of legislative history, prevented subsection 7(3) from applying abroad.

We are not persuaded by the Second Circuit's reasoning. *Gatlin* examined subsection 7(3)'s statutory predecessors and concluded that Congress drafted the provision without any inkling that it would be applied extraterritorially.[3] The court emphasized that earlier versions of subsection 7(3), enacted in 1790 and 1909, criminalized acts within the "exclusive" jurisdiction of the United States. *See* Act of March 4, 1909, ch. 321, § 272, 35 Stat. 1088 (defining territorial jurisdiction to include territory within the "exclusive jurisdiction" of the United States); Act of April 30, 1790, ch. 9, § 3, 1 Stat. 112 (proscribing crimes

---

**3.** *Gatlin* also found that Congress's failure to fill the supposed "jurisdictional gap" over civilians on military bases confirmed a legislative belief in the existence of that jurisdictional gap. *See Gatlin*, 216 F.3d at 209, 221–22 & n. 23. We doubt whether the beliefs of subsequent legislatures have *any* bearing upon the interpretation of a statute already on the books. But since the only circuit to consider the issue concluded that jurisdiction exists, legislative inaction over the twenty-seven years since *Erdos* would suggest, if anything, congressional acquiescence in the Fourth Circuit's decision.

The dissent makes much of the fact that Congress responded to *Gatlin* by enacting a bill to remove any doubt over American jurisdiction. *See* Dissent at 1197 (citing Military Extraterritorial Jurisdiction Act of 2000, S. 768, 106th Cong. (2000)). But if this gap has existed for decades, as the dissent purports, then why did Congress close it only now? The answer, of course, is that so long as the gap only existed in law reviews, Congress had no need to resolve the ambiguity. But *Gatlin*'s novel interpretation of subsection 7(3) prodded Congress to remove the circuit split. In any event, we fail to see how recent legislative action can help us interpret a law that has been on the books in one form or another since 1790.

within the "sole and exclusive jurisdiction" of the United States). Because the United States had exclusive jurisdiction only over domestic territory, *Gatlin* reasoned Congress could not have intended the laws to apply abroad. *See Gatlin*, 216 F.3d at 218 ("[T]he limitation of jurisdiction to lands over which the United States exercises 'exclusive' jurisdiction again makes plain that [the 1909 statute] did not mean to refer to land in foreign territory."); *id.* at 216–17 ("The notion that the United States could exercise *exclusive* legislative jurisdiction over lands in a foreign nation" was "virtually inconceivable in 1790.").

Nor, said *Gatlin*, did Congress intend to apply the statute extraterritorially in 1940, when it expanded its coverage to areas within the concurrent jurisdiction of the United States. *See* Act of June 11, 1940, ch. 323, 54 Stat. 304. "[W]hat little legislative history there is of the 1940 Act," *Gatlin*, 216 F.3d at 219, suggested to *Gatlin* that Congress added concurrent jurisdiction only to expand the reach of federal law to domestic highways, national parks and other areas where the federal and state governments exercised concurrent jurisdiction. *See id.* (citing H.R.Rep. No. 76–1623, at 2 (1940); S.Rep. No. 76–1708, at 1 (1940)). *Gatlin*'s investigation of the legislative history behind these three acts uncovered no evidence that Congress intended subsection 7(3) to apply to lands located beyond the borders of the various states.

The linchpin of *Gatlin*'s analysis was its assumption that it would have been "virtually inconceivable" for Congress in the eighteenth and nineteenth centuries to speak of the United States having exclusive jurisdiction outside the country's territorial limits. *Gatlin*, 216 F.3d at 217.[4] Therefore, when Congress used "exclusive jurisdiction" in subsection 7(3), the term could only have referred to territory the United States acquired from the states. But nineteenth century Americans were hardly so parochial. While they may have believed that, so long as territory remained unequivocally foreign, it lay outside the jurisdiction of the United States, they were well aware that territory could change hands, and the United States could gain exclusive jurisdiction over territory that other countries claimed as their own. *See Jones v. United States*, 137 U.S. 202, 212, 11 S.Ct. 80, 34 L.Ed. 691 (1890) ("By the law of nations, recognized by all civilized States, dominion of new territory may be acquired by discovery and occupation, as well as by cession or conquest...."); *Late Corporation of the Church of Jesus Christ of Latter–Day Saints v. United States*, 136 U.S. 1, 42, 10 S.Ct. 792, 34 L.Ed. 478 (1890) ("The power to make acquisitions of territory by conquest, by treaty and by cession is an incident of national sovereignty."); *American Ins. Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 540, 7 L.Ed. 242 (1828) ("[The] government possesses the power of acquiring territory, either by conquest or by treaty."). Over the course of the nineteenth century, the United States purchased Louisiana from France; won Florida from Spain; defeated numerous Indian nations; annexed the Republic of Texas; divided Oregon with the British; conquered Mexico's California possessions; purchased Alaska from Russia; and annexed Hawaii. This was clearly not a time when Americans thought of their borders as static or of foreign territory as sacrosanct.

The original 1790 Act provided basic criminal laws for lands outside the jurisdiction of any other sovereign. *See, e.g., Watts v. United States*, 1 Wash. Terr. 288, 297–98, 1870 WL 2118 (Wash.1870) ("The intent seems ... to have been to prevent

---

4. *Gatlin*'s skepticism presumably extended only to jurisdiction over foreign territory. Nations have long enjoyed the right to exercise jurisdiction over acts committed outside of their own territory by their nationals. *See* Henry Wheaton, *Elements of International Law*, § 113 (James Brown Scott ed., Clarendon Press 1936) (Richard H. Dana, Jr. ed., 8th ed. 1866) (recognizing that the state's judicial power extended to the punishment of offenses "by its subjects, wheresoever committed").

that detestable crime [murder] from finding harbor and impunity in places where no other law than that of the United States could reach to punish."). The act criminalized murder, larceny and other crimes committed "within any fort, arsenal, dockyard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States." 1790 Act, 1 Stat. at 113. That provision applied not only to the various federal facilities enumerated, but also to "any other place or district of country" not subject to an alternate system of laws. *Id.*

As the United States acquired new possessions, Congress extended federal criminal jurisdiction with the boundaries of the young republic. Special provisions of the organic acts of Louisiana and Florida applied the 1790 Act to land not subject to the territorial governments in those territories. *See An Act for the Establishment of a Territorial Government in Florida,* ch. 13, § 9, 3 Stat. 654 (1822); *An Act Erecting Louisiana into Two Territories,* ch. 38, § 7, 2 Stat. 283 (1804). In 1817, Congress provided that U.S. territory remaining under Indian control nevertheless lay within the "sole and exclusive" criminal jurisdiction of the United States. *See An Act to Provide for the Punishment of Crimes and Offences Committed Within the Indian Boundaries,* ch. 92, § 1, 3 Stat. 383 (1817). The Indian Intercourse Act subsequently defined such territory to include all of the Louisiana territory except the states of Missouri, Louisiana and the territory of Arkansas. *See An Act to Regulate Trade and Intercourse with the Indian Tribes and to Preserve Peace on the Frontiers,* ch. 161, § 1, 4 Stat. 729 (1834). As the United States expanded across the continent, the Supreme Court extended that "sole and exclusive" jurisdiction to *all* the unsettled territories in the American west. *See Ex parte Crow Dog,* 109 U.S. 556, 560–62, 3 S.Ct. 396, 27 L.Ed. 1030 (1883) (holding that "Indian country" included all land in the United States not organized into states or self-governing territories and that the Dakota territory lay within U.S. jurisdiction); *see also Cook v. United*

*States,* 138 U.S. 157, 180, 11 S.Ct. 268, 34 L.Ed. 906 (1891) (holding that the Public Land Strip, now the Oklahoma panhandle, lay within federal criminal jurisdiction). Thus, in the nineteenth century, the special territorial jurisdiction of the United States included vast expanses of territory lying beyond the boundaries of the states.

Congress's regulation of the Indian territory demonstrates the error in presuming that nineteenth-century Americans believed territorial jurisdiction was an all-or-nothing concept. Although the Indian territory was part of the United States, the federal government respected the Indian tribes' political claims over the lands within their possession. *See, e.g., Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 16–17, 8 L.Ed. 25 (1831) (describing the tribes as "domestic dependent nations" that had an "unquestionable" right to lands within their possession yet whose territory was nonetheless under the sovereignty of the United States). Congress recognized this concurrent jurisdiction by exempting from federal criminal jurisdiction crimes committed "by one Indian against the person or property of another Indian," leaving such crimes within the tribes' exclusive jurisdiction. Indian Intercourse Act, § 25, 4 Stat. at 733. This shared jurisdictional scheme accommodated the needs of the concurrent authorities over the Indian territory, resembling in some respects the agreements worked out by the United States with the host countries in this case. *See* pp. 1181–83 *infra.*

In extending the reach of United States jurisdiction, Congress did not stop with the continental possessions of the nation. The Guano Islands Act of 1856 asserted criminal jurisdiction over islands claimed by Americans for their guano deposits. *See An Act to Authorize Protection to Be Given to Citizens of the United States Who May Discover Deposits of Guano,* ch. 164, § 6, 11 Stat. 119, 120 (1856). The act gave the President the discretion to claim faraway islands as U.S. territory, *see id.* § 1, 11 Stat. at 119, and then granted federal

courts criminal jurisdiction over the islands to the full extent of their jurisdiction over crimes committed on the high seas. *See id.* § 6, 11 Stat. at 120. When the United States claimed territory far beyond its borders, Congress promptly extended federal jurisdiction to those areas under U.S. control.

Contrary to *Gatlin*'s suggestion, the United States at times *did* assert criminal jurisdiction over territories claimed by another sovereign. In *Jones*, 137 U.S. at 212, 11 S.Ct. 80, the defendant sought to evade prosecution by claiming that a murder on the guano island of Navassa was not under U.S. jurisdiction, because the island was claimed by the government of Haiti. Likewise, in *Watts*, 1 Wash. Terr. 288, the defendant claimed that San Juan Island, off the coast of Washington, was not within the "sole and exclusive jurisdiction of the United States," because Great Britain claimed title to the land as well. In both cases, the courts rejected the jurisdictional challenge on the ground that questions of sovereignty were the province of the other branches of government. *See Jones*, 137 U.S. at 212, 11 S.Ct. 80 ("Who is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political, question, the determination of which by [the political branches] conclusively binds the judges...."); *Watts*, 1 Wash. Terr. at 296 ("Since ... the United States claims San Juan Island, we must treat it as under the general laws of the United States...."). Courts had no hesitation about treating these territories as within our exclusive jurisdiction, even though foreign governments claimed the territory as their own.

When in 1909, Congress placed these various jurisdictional provisions within a single statute, it understood criminal jurisdiction to extend to all lands claimed by the United States, without regard to whether they were within a particular state or even within the continental United States. Congress declined to assert jurisdiction over territories subject to the more comprehensive criminal codes of the states or self-governing territories. But it showed no intent to limit jurisdiction on the basis of geography alone. We see no reason then to presume that when, in 1940, Congress extended criminal jurisdiction to those lands under the concurrent authority of the United States, it intended to limit the reach of subsection 7(3) to areas under the concurrent authority of the states, but not those under the concurrent authority of other sovereigns.

Although *Gatlin* purported to rely on the legislative history of subsection 7(3), there is, in fact, very little in the legislative record that speaks to the question presented to us. *Gatlin* rather, relies on its reading of the historical record, its understanding of what the legislators must have assumed when they used particular words and phrases. We believe that *Gatlin* reached the wrong conclusion by failing to take into account our nation's history of rapid territorial expansion during the late eighteenth and nineteenth centuries. *Gatlin* also erred, in our view, by considering subsection 7(3) in isolation from its neighboring subsections because the court believed "most subsections of § 7 were enacted separately by Congress and have their own legislative histories." *Gatlin*, 216 F.3d at 216 n. 11.

But what history shows is that Congress never understood the provisions of section 7 to be separate fragments of jurisdiction. Indeed, when Congress extended federal criminal jurisdiction, it did so by reference. The Indian Intercourse Act criminalized actions in Indian territory that would be crimes if "committed within any place or district of country within the sole and exclusive jurisdiction of the United States." Indian Intercourse Act, § 25, 4 Stat. at 733. Likewise, the Guano Islands Act provided that crimes on the guano islands would be "punished according to the laws of the United States relating to such ships or vessels and offences on the high seas." Guano Islands Act, § 6, 11 Stat. at 120. This history demonstrates that Congress understood these discrete statutes as extensions of the fundamental principle artic-

ulated in the 1790 Act: The federal government had an obligation to provide basic criminal laws for territory over which it had control.

*Gatlin* holds that if Congress wanted to extend the jurisdiction of the federal courts beyond the borders of the collective states, it had to express its intent in *each* relevant subsection. *See Gatlin*, 216 F.3d at 216 n. 11 ("[S]ubsections like § 7(7) confirm that Congress knows how to legislate extraterritorially when it so desires."). We see no reason to impose such a burden on Congress. The Supreme Court found that Congress rebuts the territorial presumption simply by demonstrating that it drafted the statute with extraterritorial concerns in mind. *See Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (presumption overcome when Congress demonstrates an "intention other than the normal one"). The Second Circuit would require Congress to engage in the pointless exercise of repeating its designs throughout every subsection of a section clearly devoted to extending the reach of U.S. law to all places under the dominion of the United States.

■ And to what end? The Second Circuit was concerned that applying our law to U.S. possessions abroad might invite the "unintended clashes between our laws and those of other nations" that the territorial presumption helps avoid. *Gatlin*, 216 F.3d at 216 n. 11 (quoting *EEOC v. Arabian Am. Oil Co. ("Aramco")*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)). But the Constitution leaves it to the political branches, not the courts, to determine the territory over which the United States enjoys legislative jurisdiction. *See, e.g., First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 766, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (noting that the political branches and not the judiciary determine whether the United States exer-

cises sovereignty over territory); *Jones*, 137 U.S. at 212, 11 S.Ct. 80 (same). "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (internal quotation marks omitted). By bringing this action against Corey, the Executive has asserted U.S. jurisdiction over Americans in the foreign territories under U.S. control; any objections from foreign governments will be directed to our State Department, which will then decide whether our national interest is served by persisting. It is not our province to second-guess this decision.

Thus, construing subsection 7(3) as applying only to federal lands within the United States serves neither congressional intent nor American foreign policy. All it does is hand a get-out-of-jail-free card to American civilians who violate U.S. law while stationed abroad.[5]

## IV

We next consider whether the areas in this case—the Yokota Air Force Base and Lopez Court—are lands "reserved or acquired for the use of the United States" and "under the exclusive or concurrent jurisdiction thereof" for purposes of 18 U.S.C. § 7(3).

### A. "Reserved or Acquired for the Use of the United States"

■ The meaning of "reserved or acquired for the use of the United States" is plain enough. Courts have demonstrated their faith in the words' clarity by skipping over them without explication. *See United States v. Blunt*, 558 F.2d 1245, 1246 (6th Cir.1977); *United States v. Erdos*, 474 F.2d 157, 159 (4th Cir.1973); *United States*

---

5. The *Gatlin* panel recognized as much when it took the unusual step of sending a copy of its opinion to the relevant House and Senate committees with the implicit message that Congress ought to correct the problem legislatively. *See Gatlin*, 216 F.3d at 223. *Gatlin*

thus acknowledged that there is no real conflict between U.S. and foreign law when the United States prosecutes a U.S. citizen—who is a government employee—for crimes against a U.S. national on territory under the dominion of the United States.

*v. Bin Laden,* 92 F.Supp.2d 189, 204–06 (S.D.N.Y.2000); *Witten v. Pitman,* 613 F.Supp. 63, 65–66 (S.D.Fla.1985). Before we do the same, we note that these words do not explicitly refer to any particular estate in the land in question. *See Blunt,* 558 F.2d at 1246–47 (finding subsection 7(3) to apply to a federal prison without regard to whether the United States had title to the land). There is no requirement that the United States be an owner, or even an occupant, so long as the land has been set aside for the use of an instrumentality of the federal government.

■ By this standard, there is not much question that the Yokota Air Force Base has been acquired for the use of the United States. The United States first occupied the territory upon which the base is located following Japan's surrender in World War II. In negotiating Japan's return to self-government, the Japanese government agreed that the United States would retain control over certain areas of the country, including the territory on which the base is located. *See* Preliminary Working Group Under the Exchange of Notes Between the Governments of the United States and Japan on 28 February 1952, Minutes of the Eighth Meeting, at 20 (Apr. 3, 1952). For almost half a century, the United States has used the Japanese land in question in the same manner as it uses American land on which are located domestic military installations.

■ Likewise, the United States has acquired Lopez Court for its own use. The State Department leased the apartment building from a private landlord for the purpose of housing our embassy personnel. *See* Lease No. 723574, Gov't Ex. 5, *United States v. Corey,* No. 96–01019–DAE (June 23, 1997); Lease No. S–314–FBO–136, Gov't Ex. 6, *Corey,* No. 96–01019–DAE. The government furnishes and maintains the apartments, and the lease runs without regard to the residence of a particular employee. *See* Transcript of Testimony of Judith A. Senykoff, Housing Officer at the U.S. Embassy in Manila, *Corey,* No. 96–01019–DAE, at 42. In addition to signing the lease, the government pays rent and utilities, and provides security for the buildings. *See id.* at 40. Lopez Court was not Corey's private residence; it was an apartment acquired by the State Department for governmental use.[6]

Thus, both the Yokota Air Force Base and Lopez Court are lands "reserved or acquired for the use of the United States" within the meaning of subsection 7(3).

**B. "Exclusive or Concurrent Jurisdiction"**

■ We next consider whether the United States exercises "exclusive or concurrent" jurisdiction over the Air Force Base and Lopez Court. The jurisdiction in question is not that of the federal courts. If it were, subsection 7(3) would be trivial, if not tautological, defining a subset of territory over which the courts already had jurisdiction. The provision instead refers to "legislative jurisdiction," *see Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting); *Aramco,* 499 U.S. at 253, 111 S.Ct. 1227, or what international lawyers understand as the "jurisdiction to prescribe." *Restatement (Third) of the Foreign Relations Law of the United States* § 401 (1987). This legislative jurisdiction, as defined by the *Restatement,* is the state's authority "to make its law applicable to the activities, relations, or status of persons." *Id.; see also* Myres S. McDougal & W. Michael Reisman, *International Law in Contemporary Perspective* 1273 (1981) ("The initial assertion of a competence to *prescribe* is the claim to project policies regulating actors

---

6. The dissent presumes that section 7(3) would extend federal criminal jurisdiction to all property leased by the United States abroad. *See* Dissent at 1195. But section 7(3) also requires that the property be within the exclusive or concurrent jurisdiction of the federal government. Section 7(3) will not apply to all leased properties, but only to those properties over which the United States has obtained legislative jurisdiction by treaty or otherwise.

or activities that is manifested either in legislative enactments or in prescriptions developed as customary law."). Thus, subsection 7(3) grants the courts jurisdiction over those territories over which the government enjoys regulatory authority.

■ This definition under international law conforms with the Fourth Circuit's interpretation of subsection 7(3). *Erdos* described this standard as one of the "practical usage and dominion" enjoyed by the United States over "the embassy or other federal establishment." *Erdos*, 474 F.2d at 159. Under this test, the court considers whether the United States enjoys such control over the area that the law should constructively regard it as United States territory. *Erdos* found this standard met by United States dominion over the embassy territory in Equatorial Guinea. Likewise, the Sixth Circuit adopted this test in finding jurisdiction under subsection 7(3) over a federal prison in Kentucky. *See Blunt*, 558 F.2d at 1246–47 (rejecting the defendant's claim that the United States must establish chain of title in order to place the land within the special territorial jurisdiction of 7(3)). This "practical dominion" standard reflects the appropriate test for determining United States jurisdiction under subsection 7(3).

Under subsection 7(3), U.S. territorial jurisdiction need not be exclusive. We have recognized that embassy property "remains the territory of the receiving state, and does not constitute territory of the United States." *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir.1983).[7] Likewise, the Status of Forces Agreement preserves Japan's jurisdiction over the Yokota Air Force Base; even though used by the United States for its purposes, the land on which the base is located continues to be part of Japan. *See* Agreement Under Article VI of the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, Regarding Facilities and Areas and the Status of United States Armed Forces in Japan (SOFA), art. II, Jan. 19, 1960, 11 U.S.T. 1652. But acknowledging the claims of the foreign government does not determine whether the United States exercises concurrent jurisdiction over that territory—particularly with regard to the actions of its own citizens.

■ *Bin Laden* concluded that concurrent territorial jurisdiction over embassy property would violate international law. *See Bin Laden*, 92 F.Supp.2d at 213–14. *Bin Laden* ruled that embassy property fell outside the United States's special jurisdiction, and so dismissed a murder charge against the terrorists who bombed the American embassies in Kenya and Tanzania.[8] Federal courts have long rec-

7. *McKeel* continued: "Thus, United States embassies are not within the territorial jurisdiction of the United States." *McKeel*, 722 F.2d at 588 (citing *Meredith v. United States*, 330 F.2d 9, 10–11 (9th Cir.1964)). That observation should not be understood as holding that the embassy lies outside the concurrent jurisdiction of the United States under subsection 7(3). The question before *McKeel* was whether torts committed at the embassy, namely Iran's seizure of U.S. embassy personnel, "occurr[ed] in the United States" for the purposes of the Foreign Sovereign Immunities Act (FSIA). *Id.* at 587. Thus, the issue was really whether the embassy was under the *exclusive* territorial jurisdiction of the United States.

    *McKeel* concluded that torts committed on embassy property were not torts "occurring in the United States," but nonetheless accepted that "United States embassies are subject to the jurisdiction of the United States for

certain purposes." *Id.* at 587–88. *McKeel's* reliance on *Meredith* supports this reading of *McKeel*, since *Meredith* held only that embassy property lay within the territory of the foreign country. *See Meredith*, 330 F.2d at 10–11 (U.S. embassy in Thailand is "in a foreign country" for purposes of the Federal Tort Claims Act). Likewise, this understanding is the only one consistent with the Supreme Court's subsequent recognition in *Aramco* that U.S. territorial jurisdiction includes "places over which the United States has sovereignty or has *some measure of legislative control*." *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 (emphasis added).

8. *Bin Laden* did hold that the terrorists might be prosecuted for other crimes that it found fell within the *Bowman* exception, including bombing United States property under 18 U.S.C. § 844(f)(1); killing in connection with the destruction of such property under 18

ognized that " 'an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains.' " *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) (quoting *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804) (Marshall, C.J.)). If it were true that concurrent territorial jurisdiction violated international law, then we would arguably have to conclude that subsection 7(3) did not apply to the lands at issue in this case.[9]

But the *Charming Betsy* rule does not apply because there is no conflict with international law to avoid. Concurrent jurisdiction is well-recognized in international law. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 922 (D.C.Cir.1984) (stating that "two or more states may have legitimate inter-

ests in prescribing governing law over a particular controversy"); *Restatement, supra*, §§ 402–03. We have recognized that "[t]he law of nations permits the exercise of criminal jurisdiction by a nation under five general principles: territorial, national, protective, universality, and passive personality." *United States v. Felix–Gutierrez*, 940 F.2d 1200, 1205 (9th Cir.1991). These distinct fonts of power often leave two nations with concurrent authority over a particular controversy, and American courts have on numerous occasions managed conflicts arising when two nations had authority over the same issue. *See, e.g., Romero v. International Terminal Operating Co.*, 358 U.S. 354, 381–83, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) (Spanish seaman on Spanish ship injured in U.S. waters); *Lauritzen v. Larsen*, 345 U.S. 571, 577–83, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (Danish seaman on Danish ship in-

U.S.C. § 844(f)(3); and killing a federal officer in the line of duty under 18 U.S.C. § 1114. *See Bin Laden*, 92 F.Supp.2d at 198–204.

9. We use "arguably" deliberately. Even if concurrent territorial jurisdiction were not permissible under international law, the *Charming Betsy* principle would probably not apply for two independent reasons. First, the Supreme Court has never invoked *Charming Betsy* against the United States in a suit in which it was a party. *Charming Betsy* itself concerned a private dispute where the Court had to determine whether the ship could be seized for violating the American embargo against France. Faced with the choice, the Court interpreted the relevant statute so as to avoid embroiling the nation in a foreign policy dispute unforeseen by either the President or Congress. *See Charming Betsy*, 6 U.S. at 118. These concerns are obviously much less serious where the interpretation arguably violating international law is urged upon us by the Executive Branch of our government. When construing a statute with potential foreign policy implications, we must presume that the President has evaluated the foreign policy consequences of such an exercise of U.S. law and determined that it serves the interests of the United States. *See* p. 1176 *supra*.

*Charming Betsy* is likely inapplicable in this case for a second, separate reason: There is

no doubt that the United States may exercise jurisdiction over American nationals living abroad, regardless of where the crime is committed. *See Blackmer v. United States*, 284 U.S. 421, 437 n. 2, 52 S.Ct. 252, 76 L.Ed. 375 (1932) ("The law of Nations does not prevent a State from exercising jurisdiction over its subjects travelling or residing abroad, since they remain under its personal supremacy." (internal quotations marks omitted)); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 922 (D.C.Cir.1984). Thus, interpreting subsection 7(3) to include jurisdiction over Corey would not violate international law. To be sure, questions might arise if the same interpretation of subsection 7(3) authorized the government to prosecute a foreign citizen in a subsequent case, but we can presume that the Executive Branch would not precipitate an international conflict by bringing such a prosecution. Even if it did, the courts could avoid the conflict by construing the subsection with reference to the principle that "statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815, 113 S.Ct. 2891, 125 L.Ed.2d 612 (Scalia, J., dissenting); *see also Romero v. International Terminal Operating Co.*, 358 U.S. 354, 381–84, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) (interpreting the Jones Act not to apply to a tort committed against a Spanish sailor on Spanish vessel in American territorial waters).

jured in Cuban waters); *Sabena*, 731 F.2d at 921–22 (antitrust case litigated in both American and English courts); *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 614 (9th Cir.1976) (antitrust violation in Honduras with effects in the United States). Thus, concurrent jurisdiction as such raises no eyebrows among international lawyers.

*Bin Laden* theorized that concurrent jurisdiction, by which it meant concurrent territorial jurisdiction, was inconsistent with the very notion of sovereignty. *See Bin Laden*, 92 F.Supp.2d at 213–14. But the American experience belies the notion that the atom of sovereignty cannot be split. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring). There is no question that domestic lands may fall under the concurrent jurisdiction of the state and federal governments. *See North Dakota v. United States*, 495 U.S. 423, 429 n. 2, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) ("A territory under concurrent jurisdiction is generally subject to the plenary authority of both the Federal Government and the State. . . .").

*Bin Laden* suggested that concurrent territorial jurisdiction was only possible in the United States because the individual states were not "independent sovereign nations, but rather political sub-units of the United States." *Bin Laden*, 92 F.Supp.2d at 214. Although the states are not independent nations, they are hardly "political sub-units" of the federal government. *See, e.g., Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 2247, 144 L.Ed.2d 636 (1999) (The states retain "the dignity and essential attributes inhering" in sovereignty.); *Seminole Tribe v. Florida*, 517 U.S. 44, 71 n. 15, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("The Constitution specifically recognizes the States as sovereign entities."); *The Federalist* No. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961) (The States "form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere.").

■ Two sovereignties may exercise concurrent jurisdiction when their relationship is regulated by law. In the United States, the Constitution permits the state and federal governments to exercise concurrent jurisdiction without undue interference. While the Supremacy Clause normally resolves any conflict in favor of the federal government, that is not always the case. *See, e.g., Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). What matters is not whose law trumps in particular situations but that there is a law-driven means for resolving any conflict.

■ The principle applies no less in the international domain. Independent nations cede their exclusive control over their territory through treaties, and the terms of those agreements govern that concurrent authority. *See Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 381–83, 69 S.Ct. 140, 93 L.Ed. 76 (1948) (recognizing that the United States may exercise jurisdiction over land placed under its control by treaty even though the territory remains part of the United Kingdom); *In re Ross*, 140 U.S. 453, 464, 11 S.Ct. 897, 35 L.Ed. 581 (1891) ("When . . . the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree. . . ."); *Schooner Exchange v. M'Faddon*, 7 Cranch 116, 11 U.S. 116, 136, 3 L.Ed. 287 (1812) (finding a nation's jurisdiction "susceptible of no limitation, *not imposed by itself*" (emphasis added)); Letter from Secretary of State Thomas Jefferson to U.S. Minister to France Gouverneur Morris (Aug. 16, 1793), *reprinted in 1 American State Papers: Foreign Relations* 167, 169 (Walter Lowrie & Matthew St. Clair Clarke eds., 1832) ("If [a nation] cedes any portion of that jurisdiction to judges appointed by another nation, the limits of their power must depend on the instrument of cession.").

■ The SOFA with Japan and the Vienna Convention on Diplomatic Relations delimit the respective spheres of jurisdiction over the territory reserved for the use of American soldiers and diplomats. *See* SOFA, *supra*, arts. III, XVII; Vienna Convention on Diplomatic Relations, Apr. 18, 1961, arts. 22, 30–31, 23 U.S.T. 3227, 500 U.N.T.S. 95. The Vienna Convention severely constrains the Philippine government's jurisdiction over U.S. embassy territory, just as the SOFA limits the Japanese government's control over the Air Force Base. In turn, these treaties grant the United States the power—and the responsibility—to regulate affairs on those territories. Indeed, the treaties leave the United States with substantially greater authority to regulate conduct than the host country. For us to decline jurisdiction in this case would upset the jurisdictional balance established by these treaties.[10]

The United States exerts practical dominion over activities on the Yokota Air Force Base. The SOFA with Japan provides that "[w]ithin the facilities and areas, the United States may take all the measures necessary for their establishment, operation, safeguarding and control." SOFA, *supra*, art. III. That broad language alone would confer upon Congress the legislative jurisdiction to prescribe and enforce the laws necessary for the management and security of the Yokota Air Force Base. But Article XVII goes farther and explicitly grants the U.S. military the authority to exercise criminal jurisdiction over all persons subject to military law. *See id.* at XVII(1). Where jurisdiction is concurrent, the SOFA grants the United States the primary right to try U.S. military and civilian personnel for offenses committed solely against U.S. security, property or persons. *See id.* at

---

10. The dissent reads *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), and *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), as suggesting that the Supreme Court "was aware of the jurisdictional gap issue." *See* Dissent at 1196. But neither case says anything of the sort. *Reid* and *Kinsella* held that non-Article III military tribunals could not exercise jurisdiction over non-military personnel in criminal cases. *See Reid*, 354 U.S. at 5, 77 S.Ct. 1222; *Kinsella*, 361 U.S. at 249, 80 S.Ct. 297. The Court did not consider subsection 7(3) in either of these cases, and so they can't fairly be read as expressing *any* view as to whether this subsection did or did not extend the judicial power of the United States to acts committed abroad.

The dissent quotes selectively from these cases but, when read in context, the statements have little to do with our case. *See* Dissent at 1196. Two of the quotes reason from the litigating positions of government lawyers. *See Reid*, 354 U.S. at 48, 77 S.Ct. 1222 (Frankfurter, J., concurring in result) ("A further argument is made that a decision adverse to the Government would mean that only a foreign trial could be had. Even assuming that the NATO Status of Forces Agreement ... gives jurisdiction to the United States only through its military authorities...."); *Kinsella*, 361 U.S. at 245, 80 S.Ct. 297 ("At argument, the Government indicated that there had been no effort in the Congress to make any provision for the prosecution of

such cases either in continental United States or in foreign lands.").

Likewise, two of the quotes presume that, because the trial of Americans in domestic courts would be impractical, the trials must inevitably take place in foreign courts. *See Reid*, 354 U.S. at 88, 77 S.Ct. 1222 (Clark, J., dissenting) (suggesting that because trial by domestic federal courts would be "impracticable as a general solution," Congress would have to accept "that Americans committing offenses on foreign soil be tried by the courts of the country in which the offense is committed"); *Kinsella*, 361 U.S. at 259, 80 S.Ct. 297 (Harlan, J., dissenting) (finding the decision "regrettable because [it is] bound to disturb delicate arrangements with many foreign countries, and *may* result in our having to relinquish to other nations ... a substantial part of the jurisdiction now retained over American personnel under the Status of Forces Agreements" (emphasis added)).

Only one of the statements quoted by the dissent, that of Justice Whittaker, actually says that "jurisdiction of our civil courts does not extend" to "bases in foreign lands." *Kinsella*, 361 U.S. at 276, 80 S.Ct. 297 (Whittaker, J., concurring in part and dissenting in part). But it's quite a stretch to read this stray observation, in a case that did not concern the jurisdiction of Article III courts, as suggesting that the Supreme Court has stamped its imprimatur on the existence of a "jurisdictional gap."

XVII(3)(a)(i). Thus, the SOFA recognizes U.S. jurisdiction to try civilian employees of the armed forces for crimes committed on the Air Force Base—as in the case here.

Extraterritorial rights conferred by the SOFA have been confirmed by several decades of experience. Thomas Perham, a Department of Defense attorney staffed at Yokota, testified to the Air Force's almost exclusive control of affairs within the base. Transcript of Testimony of Thomas Perham, Chief of International Law at Department of Defense Headquarters in Yokota, Japan, *United States v. Corey*, No. 96–01019–DAE, at 14–15 (June 23, 1997). Japanese environmental, labor, and other regulatory statutes are not enforced on the base. American lawyers and doctors practice without local licenses, and gambling, which is strictly illegal in Japan, is permitted on the base. *See id.* at 14. In police matters, the U.S. government conducts all investigations, searches and arrests, and the Japanese police may not enter without the permission of the United States. *See id.* The Japanese government is generally reluctant to prosecute American civilians who commit crimes against American persons or property on the base, because it recognizes that, despite its reserved claim to the territory, such matters are properly within the sphere of American interests. *See id.* at 24; *see also* Overseas Jurisdiction Advisory Committee, *Report to the Secretary of Defense, the Attorney General, the Congress of the United States* 26 (1997).

The security personnel at the doors of Lopez Court may be less imposing than the U.S. military, but the United States exercises jurisdiction over the premises nonetheless. Indeed, the United States's legal control over embassy premises and personnel is more exclusive than that over its affairs on the military base. In centuries past, "the official residences of envoys were in every respect considered to be outside the territory of the receiving state." 1 *Oppenheim's International Law* § 494, at 1076 (Robert Jennings & Arthur Watts eds., 9th ed.1992). Indeed, some courts have continued to embrace that view. *See United States v. Archer,* 51 F.Supp. 708, 709 (S.D.Cal.1943) (An American consulate "is a part of the territory of the United States of America."); *see also Erdos,* 474 F.2d at 159 (quoting *Archer* with approval). While we have rejected this view of extraterritoriality and adopted the view that the embassy lies within the territorial jurisdiction of the host country, *see McKeel,* 722 F.2d at 588, diplomatic norms continue to constrain the host state from exercising its authority without the consent of the embassy. *See 1 Oppenheim's International Law, supra,* § 494, at 1077.

These norms were codified in the Vienna Convention on Diplomatic Relations, a treaty to which both the United States and the Philippines are signatories. *See* Vienna Convention, *supra.* Article 22 guarantees that embassy land shall remain "inviolable." *Id.* art. 22. The host country may not enter the embassy grounds without the consent of the sending state. The Convention further acknowledges that the private residences of embassy personnel, even if they are not located on the premises of the mission, enjoy the same inviolability as the embassy itself. *See id.* art. 30; *see also United States v. County of Arlington,* 702 F.2d 485 (4th Cir.1983) (finding that under the Vienna Convention an apartment building owned by East Germany is exempt from property taxes). Likewise, embassy personnel, including the support staff, enjoy absolute immunity from criminal prosecution. *See* Vienna Convention, *supra,* art. 31.

Out of necessity, diplomatic conventions have acknowledged the embassy's jurisdiction over crimes committed by its personnel. Even if the embassy territory is not considered the territory of the sending country, "an envoy must have jurisdiction over his staff in matters of discipline, he must be able to put under restraint a member of his staff who has committed a crime and is to be sent home for trial, and the like." 1 *Oppenheim's International*

*Law, supra,* § 507, at 1103. The Vienna Convention *expressly* acknowledges that the sending state may exercise criminal jurisdiction over diplomatic personnel, *see* Vienna Convention, *supra,* art. 31(4), in order to encourage states to prosecute their diplomatic agents for crimes committed on embassy territory. *See Restatement, supra,* § 464 n. 9. Diplomatic conventions thus leave no doubt about our government's right to exercise jurisdiction over Corey.

Although Lopez Court remains Philippine territory in some sense, diplomatic conventions disable the Philippine government from exerting effective control over the area. The local police could not enter the premises to investigate crimes without the consent of the ambassador. Nor could they prosecute Corey, or any other American member of the embassy staff. The United States has the real power—and the concomitant duty—to regulate conduct on those grounds.

Thus, we conclude that the United States exercises concurrent, and indeed primary, jurisdiction over the actions of United States nationals on both the Yokota Air Force Base and Lopez Court. This conclusion arises out of the plain meaning of subsection 7(3), the relevant international agreements, and the practical realities of the situation. The United States has negotiated a modus vivendi with both Japan and the Philippines for the lands under United States dominion in their respective countries. Were we to hold that federal court jurisdiction is not coextensive therewith, we would risk destabilizing the accommodation that the Executive Branch has worked out with the foreign powers. Congress intended through subsection 7(3) to avoid such dangers by extending the federal criminal laws as far as U.S. dominion.

We are not unmindful that some commentators in the military and academia have posited the existence of a jurisdictional gap over American civilians stationed at military bases abroad. *See* Overseas Jurisdiction Advisory Committee, *supra,* at 41; *Gatlin,* 216 F.3d at 221 nn. 17–20 (citing other military and academic sources that describe "jurisdictional gap"). But section 7 concerns the jurisdiction of the federal courts, and the military has no special expertise in construing such a statute. *See National Ass'n of Gov't Employees, Inc. v. Federal Labor Relations Auth.,* 179 F.3d 946, 950 (D.C.Cir.1999) (no deference to agency's interpretation of statute it is not charged with administering); *California Nat'l Guard v. Federal Labor Relations Auth.,* 697 F.2d 874, 879 (9th Cir. 1983) (same). We see no reason to create a jurisdictional vacuum where the better reading of the statute supports jurisdiction.

## V

Both Lopez Court and the Yokota Air Force Base fall within the "special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 7. The district court had jurisdiction to hear the charges against Corey under 18 U.S.C. §§ 2241(a) and 2242(1).

**AFFIRMED.**[11]

McKEOWN, Circuit Judge, dissenting:

The central and threshold question in this appeal is whether certain sections of the federal criminal code, specifically 18 U.S.C. §§ 2241(a) and 2242(1), apply extraterritorially so as to reach crimes committed on foreign soil. I conclude that they do not and therefore respectfully dissent. As the Supreme Court so clearly stated in *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("*Aramco*"), "[w]e assume that Congress legislates against [a] backdrop of the presumption against extraterritoriality." In my view, this presumption against extraterritorial application of federal law, combined with the ambiguous language of

---

11. While we affirm the district court on the jurisdictional ruling, we reverse the conviction because of errors later at trial. We state the reasons for this ruling in a memorandum disposition filed concurrently with this opinion.

the statutes and the absence of any clear Congressional intent to include foreign locations, compel the conclusion that the district court did not have jurisdiction. In short, I do not think that Congress has provided for the application of these statutes to government-leased housing in the Philippines or housing on a military base in Japan. Notably, Congress recently confirmed the existence of this "jurisdictional gap" by passing legislation to extend jurisdiction to American civilians like Corey who are employed by or accompany the military overseas. Absent such clear intent to extend the reach of U.S. laws to Corey, however, we are without jurisdiction in this case.

In reaching the opposite conclusion, the majority creates a circuit split, *see United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000),[1] chooses not to apply the well-established presumption against extraterritorial application of U.S. statutes, and misinterprets 18 U.S.C. § 7(3) by ignoring its legislative history and instead relying upon a tangential historical record. Regardless of the recent legislation, this case raises a very important issue, both for Corey individually and because the majority adopts an unprecedented view of the presumption against extraterritoriality.

## I. THE NARROW ISSUE PRESENTED

The majority and I share significant common ground. I agree that neither the Constitution nor the principles of international law would prevent Congress from extending the reach of a federal criminal

law to Corey, a U.S. citizen. *See Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 ("Congress has the authority to enforce its laws beyond the territorial boundaries of the United States"); *Skiriotes v. Florida*, 313 U.S. 69, 73, 61 S.Ct. 924, 85 L.Ed. 1193 (1941) ("[T]he United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed."); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir.1983) ("Nationality and the protective principle do allow the United States to assert jurisdiction over individuals for events occurring at United States embassies and consulates."); *see generally United States v. Vasquez–Velasco*, 15 F.3d 833, 840 & n. 5 (9th Cir.1994) (explaining various bases of jurisdiction under international law).[2]

I also agree that the relevant international agreements, namely (1) the Agreement Under Article VI of the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, Regarding Facilities and Areas and the Status of United States Armed Forces in Japan (SOFA), Jan. 19, 1960, 11 U.S.T. 1652, and (2) the Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, provide the necessary authority for Congress to enact criminal legislation applicable to these locales. In short, there is no doubt that Congress can ensure that U.S. citizens who engage in heinous criminal activity overseas will stand trial in a United States court.

1. The majority creates a circuit split with regard to application of the presumption against extraterritoriality. *Gatlin* holds that the presumption is applicable; the majority disagrees. When the Fourth Circuit interpreted § 7(3) more than 25 years ago, it did not address the issue. *See United States v. Erdos*, 474 F.2d 157 (4th Cir.1973).

2. Whether the "jurisdiction" at issue here is labeled subject-matter jurisdiction (of the district court) or legislative (also referred to as prescriptive) jurisdiction (in other words, the power of Congress to legislate), *see Hartford*

*Fire Ins. Co. v. California*, 509 U.S. 764, 813, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting) (discussing difference and explaining that legislative jurisdiction "refers to the authority of a state to make its laws applicable to persons or activities") (internal quotations omitted), does not affect the analysis. The question remains whether Congress in fact provided for overseas application of these federal penal statutes. *See id.* at 814, 113 S.Ct. 2891 ("[T]he question in this litigation is whether, and to what extent, Congress *has* exercised that undoubted legislative jurisdiction in enacting the Sherman Act.").

But this is not a case about power. The issue before us is whether Congress exercised that power, specifically whether Congress *intended* the penal statutes that criminalize Corey's conduct to apply extraterritorially. *See Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 ("Whether Congress has in fact exercised that authority ... is a matter of statutory construction."); *Vasquez–Velasco*, 15 F.3d at 839. Put another way, we are not considering here whether Congress *can* bring Corey within the reach of the U.S. Criminal Code, nor are we considering whether Congress *should* do so. The only question before us is whether Congress *did* so, and it is on this point that the majority and I differ.

## II. PRESUMPTION AGAINST EXTRATERRITORIALITY

### A. The Law

Guiding our inquiry is the well-established cannon of statutory construction—the presumption against extraterritoriality—based on the understanding that Congress "is primarily concerned with domestic conditions." *Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949). "[T]he presumption against extraterritorial application of United States statutes requires that any lingering doubt regarding the reach of the [statute] be resolved against [extraterritorial application]. It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Smith v. United States*, 507 U.S. 197, 203–04, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (internal quotations omitted) (case involving Federal Torts Claims Act). This presumption "has a foundation broader than the desire to

avoid conflict with the laws of other nations." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 174, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). As the Supreme Court explained:

> [w]e have in this case a question of statutory construction. The necessary *locus*, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds, which affect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

*United States v. Bowman*, 260 U.S. 94, 97–98, 43 S.Ct. 39, 67 L.Ed. 149 (1922).

In light of this longstanding principle, courts have examined the extraterritorial applicability of statutes with the view that Congress knows how to place crimes committed outside our borders within the jurisdictional reach of a statute. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440 n. 7, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (explaining that Congress extended jurisdiction to vessels on the high seas in 18 U.S.C. § 7(1)); *see also Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 ("We assume that Congress legislates against the backdrop of the presumption against extraterritoriality.").[3]

---

**3.** In fact, the criminal code is replete with examples of unambiguous congressional intent to apply U.S. law overseas. *See, e.g.*, 18 U.S.C. § 112(e) (protection of foreign officials, official guests, and internationally protected persons); 18 U.S.C. § 175 (prohibitions with respect to biological weapons); 18 U.S.C. § 351(i) (congressional, cabinet, and Supreme Court assassination, kidnaping, and assault); 18 U.S.C. § 1621 (perjury); 18 U.S.C. § 2381 (treason). The clear manifestation rule has been followed outside the criminal context as well. *See* Wade Estey, Note, *The Five Bases of Extraterritorial Jurisdiction and the Failure of the Presumption Against*

## B. The Presumption Applies Here

The statutes at issue here, 18 U.S.C. §§ 2241(a) and 2242(1), prohibit certain forms of sexual misconduct committed "in the special maritime and territorial jurisdiction of the United States...." In turn, 18 U.S.C. § 7(3) defines "special maritime and territorial jurisdiction" as

[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

Neither precedent nor logic supports the majority's conclusion that the extraterritoriality presumption is inapplicable because a jurisdictional statute is at play. Under *Bowman*, the presumption clearly applies to criminal statutes. *See Bowman*, 260 U.S. at 98, 43 S.Ct. 39. And the majority's effort to avoid the presumption because § 7(3) defines territorial jurisdiction is bootstrapping at its worst. Although jurisdictional statutes address how far Congress wishes to extend U.S. law, absent clear language or some meaningful signal, such statutes do not necessarily indicate whether Congress intended extraterritorial jurisdiction. The majority's conclusion that we "should simply employ the standard tools of statutory interpretation" when interpreting § 7(3), *see* Maj. Op. at 1171 (quoting *Bin Laden*, 92 F.Supp.2d at 206 n. 32), brings us right back to the question at hand. In § 7(3), Congress defined "territorial jurisdiction." But "territorial" cannot be equated with "extraterritorial," and hence, we still need to determine whether Congress intended to extend the reach of "territorial jurisdiction" to foreign lands. To proceed otherwise would allow an end-run around the requirement that Congress must be explicit in demonstrating its intent to legislate extraterritorially.

Nevertheless, the majority relies on the jurisdictional nature of § 7(3) as a reason to avoid application of the presumption.[4] This position has been adopted by one district court in New York, *see United States v. Bin Laden*, 92 F.Supp.2d 189, 206 n. 32 (S.D.N.Y.2000), but subsequently was criticized by the Second Circuit in *Gatlin*. Although a district court opinion from another circuit would have no precedential value in this court, in some cases it might be instructive; but that is hardly the case here when the decision was already disavowed by the Second Circuit.[5] *See also United States v. Erdos*, 474 F.2d 157, 160

*Extraterritoriality*, 21 Hastings Int'l & Comp. L.Rev. 177, 179 (1997) (providing examples); *see generally Aramco*, 499 U.S. at 258, 111 S.Ct. 1227 ("Congress' awareness of the need to make a clear statement that a statute applies overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute.").

4. *See* Maj. Op. at 1171 ("When Congress is considering the scope of federal jurisdiction, its attention is focused precisely on how far U.S. law should reach. Unlike ordinary domestic statutes, jurisdictional statutes inherently present the question of how far Congress wishes U.S. law to extend. There is therefore no reason to presume that Congress did, or did not, mean to act extraterritorially.").

5. As the Second Circuit in *Gatlin* explained, In the present case, both parties appear to agree that the presumption against extraterritoriality applies. However, in a recent opinion involving the same jurisdictional provision at issue here, 18 U.S.C. § 7(3), Judge Sand declined to apply the presumption against extraterritoriality. *See United States v. Bin Laden*, 92 F.Supp.2d 189, 206 n. 32 (S.D.N.Y.2000). The presumption, Judge Sand reasoned, "was designed to apply to provisions that define offenses. When presented with the task of interpreting jurisdictional statutes such as Section 7(3), courts should simply employ the standard tools of statutory interpretation: analysis of text, structure, and legislative history." *Id.*

We respectfully disagree with Judge Sand. Although § 7(3) is the immediate focus of our inquiry, the ultimate question here is whether a criminal statute—*i.e.*, 18 U.S.C. § 2243(a)—applies extraterritorially. The presumption against extraterritoriality plainly applies to criminal statutes (other than the *Bowman* variety ...), so § 2243(a) applies extraterritorially only if there is a clear manifestation of Congress's affirmative intent. That this inquiry requires us to

(4th Cir.1973) (failing to address canon of construction and explaining that "[w]here the power of the Congress is clear, and the language of the exercise is broad, we perceive no duty to construe a statute narrowly.").

In its effort to avoid the presumption against extraterritoriality, the majority extends *Bowman* far beyond its holding or any reasonable extension of it. The majority states that "the presumption does not apply where the legislation implicates concerns that are not inherently domestic" and then cites *Bowman* as an example, explaining that in that case "the Supreme Court held that the territorial presumption does not govern the interpretation of criminal statutes that, by their nature, implicate the legitimate interests of the United States abroad." Maj. Op. at 1170–71.

*Bowman* does not stand for such a far-reaching proposition. Rather, *Bowman* recognizes a narrow exception to the presumption against extraterritoriality for "criminal statutes which are, as a class, not logically dependant on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." 260 U.S. at 98, 43 S.Ct. 39.[6] There can be little doubt that the narrow *Bowman* exception does not cover the pe-

nal statutes at issue here. Nor, in my view, does the narrow exception emanating from *Bowman* and its progeny-the commonsense principle that courts should not presume Congress intended to legislate domestically when it criminalizes behavior that presents a cognizable threat within our borders[7]—support the majority's conclusion. *See Kollias v. D & G Marine Maintenance,* 29 F.3d 67, 71 (2d Cir.1994) ("The Supreme Court's recent discussions of the presumption against extraterritoriality, none of which mentions *Bowman,* seem to require that *all* statutes, without exception, be construed to apply within the United States only, unless a contrary intent appears.").

The majority offers a second reason for not applying the presumption here, namely that "[l]and subject to subsection 7(3) is not 'extraterritorial,' as the Supreme Court has defined the term." Maj. Op. at 1171. In support of this statement, the majority cites to a single statement in *Aramco. See Aramco,* 499 U.S. at 248, 111 S.Ct. 1227 ("In applying this rule of construction, we look to see whether 'language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or *has some measure of legislative control.'*") (quoting *Foley Bros.,* 336 U.S. at 285, 69 S.Ct. 575) (emphasis added).[8]

look to Congress's intent in enacting 18 U.S.C. § 7, which is incorporated by reference in § 2243(a), does not, in our view, alter the applicable rule of statutory interpretation. Indeed, to accept Judge Sand's view would seriously undermine the presumption against extraterritoriality since Congress often enacts jurisdictional provisions that are then incorporated by reference elsewhere.
*Gatlin,* 216 F.3d at 212 n. 6.

**6.** This exception, however, applies to statutes involving crimes against the government, *see, e.g., United States v. Cotten,* 471 F.2d 744 (9th Cir.1973), and crimes relating to drug smuggling, *see United States v. Larsen,* 952 F.2d 1099 (9th Cir.1991) (marijuana smuggling).

**7.** *See Skiriotes,* 313 U.S. at 73–74, 61 S.Ct. 924 ("[A] criminal statute dealing with acts

that are directly injurious to the government, and are capable of perpetration without regard to particular locality, is to be construed as applicable to the citizens of the United States upon the high seas or in a foreign country, though there be no express declaration to that effect.") (citing *Bowman*); *United States v. Mitchell,* 553 F.2d 996, 1002 (5th Cir.1977) ("[I]f the nature of the law does not mandate its extraterritorial application, then a presumption arises against such application.") (citing *Bowman*).

**8.** The majority's citation to *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 533 (D.C.Cir.1993), does little to advance its argument. In *Massey,* the court addressed extraterritorial application of the National Environmental Policy Act. The court held, however, that "the presumption against the extraterritorial application of statutes de-

Read literally, as the majority proposes, this language would eviscerate the concept of extraterritoriality. If "territorial" automatically includes foreign lands where U.S. law applies, then the presumption against extraterritoriality is pointless because there would be no "extraterritorial" application of U.S. law.

The Second Circuit declined to go down a similar path in *Kollias*. The court rejected the argument that the presumption against extraterritoriality does not apply to a case involving application of the Longshore and Harbor Workers' Compensation Act (the "LHWCA") to an injury on an American flag vessel because the ship "was in effect a United States territory as it traveled across the high seas." 29 F.3d at 72. After first recognizing that the law of the flag does not necessarily govern shipboard conduct, the court exposed the underlying circularity of this reasoning:

> In any case, the concept of extraterritoriality does not refer to the body of law

scribed in *Aramco* does not apply where the conduct regulated by the statute occurs primarily, if not exclusively, in the United States, and the alleged extraterritorial effect of the statute will be felt in Antarctica—a continent without a sovereign, and an area over which the United States has a great measure of legislative control." *Id.* at 529. Unlike the conduct in *Massey*, the conduct here occurred entirely outside our borders. Moreover, the Philippines and Japan are governed by other sovereigns, unlike Antarctica, which "is generally considered to be a 'global common' and frequently analogized to outer space." *Id.* (citation omitted)

9. Although in my view the presumption against extraterritoriality applies with full force here and plainly directs the analysis, I agree with the Second Circuit's conclusion that the same result would be reached even if the presumption did not apply. *See Gatlin*, 216 F.3d at 212 n. 6; *see also Erdos*, 474 F.2d at 159–60 (acknowledging that, "indeed, it is possible that when the statute was enacted the attention of the Congress was not in the slightest focused on extraterritorial jurisdiction."). I certainly cannot join in the majority's apparent attempt to turn the presumption on its head.

It also bears noting that we are dealing with a punitive statute, and as such the rule of lenity resonates, even if not directly applica-

that governs the dispute; if it did, extraterritorial application of United States statutes would be an impossibility because any place where United States law governed a particular dispute would be considered United States territory. Accordingly, we decline to characterize the [ship] as a kind of floating United States territory, where application of the LHWCA would not be extraterritorial. *Id.*[9]

Simply declaring the foreign locations to be part of U.S. territory is a semantic sleight of hand that avoids the real question of statutory interpretation and congressional intent. I turn next to an examination of the statute itself.

## III. THE STATUTE

### A. The Statute is Ambiguous

With the presumption against extraterritoriality application as the viewing lens, the first task is to analyze the statutory text to determine whether Congress intended § 7(3) to cover the foreign locations at issue here.[10] As noted before, the spe-

ble. *See generally Staples v. United States*, 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (explaining that the rule of lenity, "under which an ambiguous criminal statute is to be construed in favor of the accused," applies "where, after seiz[ing] everything from which aid can be derived, the Court is left with an ambiguous statute") (internal quotations omitted).

10. The presumption against extraterritoriality is not insurmountable. For example, in *Vermilya–Brown Co. v. Connell*, 335 U.S. 377, 390, 69 S.Ct. 140, 93 L.Ed. 76 (1948), the Supreme Court held that the Fair Labor Standards Act, which by its terms applies to "any State of the United States or the District of Columbia or any Territory or possession of the United States," included land leased by the United States in Bermuda for use as a military base, reasoning that "possessions" includes leased bases overseas. *But see United States v. Spelar*, 338 U.S. 217, 224, 70 S.Ct. 10, 94 L.Ed. 3 (1949) (Frankfurter, J., concurring) (criticizing *Vermilya–Brown*); *id.* at 225, 70 S.Ct. 10 (Jackson, J., concurring) (suggesting that Court should "retreat from" *Vermilya–Brown*). The Court, however, did not address the presumption against extraterritoriality. Nor does the statute here include any specific language, such as "possession," to guide our inquiry.

cial maritime and territorial jurisdiction includes:

> Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 7(3).

On its face, the language of § 7(3) is ambiguous and certainly does not demonstrate an intent to apply to locations outside the borders of the United States. Although "any lands" could arguably be stretched to include foreign lands, a "plausible" reading of a statute does not overcome the presumption against extraterritoriality. *See Aramco*, 499 U.S. at 253, 111 S.Ct. 1227 ("If we were to permit possible, or even plausible, interpretations of language such as that involved here to override the presumption against extraterritorial application, there would be little left of the presumption."). Indeed, the fact that the statute has spawned such a multiplicity of interpretations, ranging from *Gatlin* to *Erdos* to the majority, underscores not only the ambiguity of the statute but also the need for the presumption itself.

Nor does the structure of § 7(3) support an intention to include foreign lands acquired overseas. In my view, both the first and second clauses of § 7(3) refer to lands *within* our borders, as the federal government may acquire lands other than "by consent of the legislature" of a state. *See James v. Dravo Contracting Co.*, 302 U.S. 134, 142, 147, 58 S.Ct. 208, 82 L.Ed. 155 (1937). Indeed, the United States acquired many lands within our present bor-

ders without the "consent" of the legislature of *any* state. *See Gatlin*, 216 F.3d at 215–16 & n. 10 (quoting Jordan J. Paust, *Non–Extraterritoriality of "Special Territorial Jurisdiction" of the United States: Forgotten History and the Errors of Erdos*, 24 Yale J. Int'l L. 305, 318–20 (1999), noting that the United States acquired Arlington National Cemetery in Virginia, places within the District of Columbia, and lands acquired in territorial form before states existed in those areas *without* the consent of the legislature of any state).

The argument that the statute must apply extraterritorially also ignores a key term within the first clause: "reserved." The first clause refers to "lands reserved or acquired." "Reserved" has a special historical meaning that has nothing to do with foreign countries. *See* Paust, 24 Yale J. Int'l L. at 325 ("[I]f the land is not owned by the United States, the land as such is not 'reserved' or 'acquired' by the United States within the ordinary meaning of those terms or the meaning clarified by legislative history and historical context, especially the special meaning of 'reserved lands.'"); *see also* Black's Law Dictionary 1307–08 (6th ed. 1990) (defining "reserved land" as "[p]ublic land that has been withheld or kept back from sale or disposition" and "reservation" as "a tract of land ... which is by public authority withdrawn from sale or settlement, and appropriated to specific public uses; such as parks, military posts, Indian lands, etc.").

This proposition is illustrated by the legislative history of the precursors to § 7(3) and the Assimilated Crimes Act, 18 U.S.C. § 13, which adopts the criminal law of the states, territories, possessions, or districts as the criminal laws for "places now exist-

---

Similarly, in the area of antitrust law, the Supreme Court has held that Congress has overcome the presumption against extraterritoriality. Adopting reasoning similar to that in *Bowman*, the Supreme Court found that the Sherman Act "reach[es] conduct outside our borders, but only when the conduct has an effect on American commerce." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 582 n. 6, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) ("[I]t is well established by now that the Sherman Act applies to conduct that was meant to produce and did in fact produce some substantial effect in the United States.").

ing or hereafter *reserved or acquired as provided in section 7 of this title ....*" 18 U.S.C. § 13(a) (emphasis added). In 1909, Congress added "reserved" to the 1874 version of that statute[11] after courts held that the statute did not apply to any territory that had been obtained by the United States in any manner other than by cession:

> [I]t was held that ... under section 5391, this law did not apply to any territory that had been obtained since [the statute was enacted in] 1825 except by cession, and it was discovered that a great deal of property, for military reservations, for arsenals, post-offices, custom-houses, quarantine stations, and court-houses had been acquired by reservation; that the United States, owning the land, existing in territorial form, would reserve a portion of it for Federal purposes, and then admit the State to the Union. The Supreme Court said, "Your act does not cover that class of cases. It is specific. It relates to territory subsequently acquired by cession. It relates to the laws of the United States that were in force at the time you passed it, to lands ceded to the United Sates by the legislature of a State in accordance with the provisions of the Constitution, but it does not relate to territory that has been subsequently acquired in any other way."

42 Cong. Rec. 584 (1908); *accord id.* at 593; Paust, 24 Yale J. Int'l L. at 316–17.[12] In other words, in 1909, Congress was concerned about the need for legislation governing land that the United States owned and retained when a new state was created. *See* Paust, 24 Yale J. Int'l L. at 317. The pointed reference to "reserved" in the first clause of § 7(3), which Congress similarly included in its 1909 precursor, suggests that *both* clauses of § 7(3) apply only domestically.

Even if, as the majority concludes, § 7(3) applies "outside the borders of the fifty states," Maj. Op. at 1172, that conclusion does not perforce mean that Congress intended it to cover lands that remain part of foreign countries. As the majority itself points out, *see* Maj. Op. at 1173–74, new lands became a part of the United States through, among other means annexation, conquest, and purchase.

Finally, the highly piecemeal fashion in which § 7 was compiled undermines the majority's attempt to read the statute holistically. *See* Maj. Op. at 1171–72. "[I]t makes little sense to inquire into congressional intent by looking at the statute as a whole since most subsections of § 7 were enacted separately by Congress and have their own legislative histories." *Gatlin*, 216 F.3d at 216 n. 11. Contrary to the majority's interpretation, the other subsections of § 7 demonstrate that Congress *explicitly provides* for jurisdiction *when it intends to do so. See, e.g.,* 18 U.S.C. § 7(1) (high seas); 18 U.S.C. § 7(6) (outer space). Congressional intent with respect to the *other* subsections of § 7, however, does *not* reflect congressional intent to extend § 7(3) across foreign borders. Indeed, in light of the fact that Congress clearly legislated extraterritorially in the

---

11. The 1874 version of the statute appeared as Section 5391 of the Revised Statutes of the United States. That section provided, in relevant part:

> If any offense be committed in any place which has been or may hereafter be, *ceded to and under the jurisdiction of the United States*, which offense is not prohibited, or the punishment thereof is not specially provided for, by any law of the United States, such offense shall be liable to, and receive, the same punishment as the laws of the State in which such place is situated....

70 Rev. Stat. § 5391 (1874) (emphasis added).

12. The amended Section 5391 provided: "Whoever, within the territorial limits of any State, organized Territory, or District, but within or upon any of the *places now existing or hereafter reserved or acquired,* described in [Section 272] of this Act," shall commit an act which is not criminalized by the United States shall be prosecuted under state law. *See* Act of March 4, 1909. ch. 321, § 289, 35 Stat. 1145 (emphasis added). As discussed *infra,* § 272(3) was the 1909 precursor to § 7(3) in which Congress similarly referred to lands "reserved or acquired."

other subsections of § 7 but did not do so in § 7(3), the presumption against extraterritoriality applies with full force.

In conclusion, although the structure of § 7(3) reinforces the conclusion that the United States may acquire lands in more than one fashion, it is a dead end in terms of analyzing whether Congress meant to include lands outside the United States and within the borders of other nations. To suggest, as the majority does, that "Congress unmistakably had foreign locales in mind when it set about defining that jurisdiction," and that the statute "extends the jurisdiction ... to areas where American citizens and property need protection, yet no other government effectively safeguards those interests," Maj. Op. at 1171, is to manufacture congressional intent by substituting a judicial policy judgment for a congressional one. The most one can conclude is that the language manifests no clear congressional intent. This statute is a poster-child for ambiguity—every court attempting to construe and harmonize the statute goes through contortions trying to explain what Congress meant but did not say. In this instance, we should look to other "available evidence," namely, the legislative history. *Sale*, 509 U.S. at 177, 113 S.Ct. 2549.

## B. Legislative History

The legislative history of § 7(3) and its precursors, *see* Act of 1790, ch. 9, 1 Stat. 112 (1790); 70 Rev. Stat., ch. 3, § 5539 (1874); Act of March 4, 1909, ch. 321, 35 Stat. 1088 (1909), reinforces the presumption against extraterritoriality. Nothing in that history suggests that Congress intended the statute to apply to foreign localities, such as embassy housing and military bases, within foreign countries; indeed, the legislative history counsels that Congress intended to address domestic, not foreign, jurisdiction.

Addressing the identical question presented here, in the context of a military base in Germany, the Second Circuit in *Gatlin* exhaustively traced the history of § 7(3) and concluded that "the legislative history of § 7(3) and its precursors demon-

strates unequivocally that Congress, in fact, intended the statute to apply exclusively to the territorial United States." 216 F.3d at 220; *id.* at 219 ("Nowhere in the legislative history of the 1909 Act— either in the floor debates or in the lengthy report of the Special Joint Committee on the Revision of the Laws—is there any indication that the statute was meant to extend federal criminal jurisdiction to land in a foreign nation.") (citations omitted); *see also Bin Laden*, 92 F.Supp.2d at 209–10; Paust, 24 Yale J. Int'l L. at 314–24.

*Gatlin* lays out the legislative history in detail and there is no need to reproduce a similar analysis here. The key to the legislative history and to interpretation of this statute lies in examination of the statute at three points in time: upon enactment in 1790, at the time of recodification in 1909, and when the statute was amended in 1940.

The statute can be traced to legislation passed by the First Congress, "An Act for the Punishment of certain Crimes Against the United States." Act of April 30, 1790, ch. 9, 1 Stat. 112 (1790). Unlike the current substantive criminal law, which references a separate statutory section that defines jurisdiction, the 1790 Act incorporated jurisdiction into the substantive definition of the offense, limiting it to certain lands "under the sole and exclusive jurisdiction of the United States." *Id.* at §§ 3, 6–7. As noted in *Gatlin*, "the fact that the 1790 Act delimited the jurisdiction of the federal courts to lands over which the United States exercised exclusive legislative jurisdiction 'virtually guarantees' that the provision was not intended to apply to offenses committed in a foreign territory." *Gatlin*, 216 F.3d at 216 (quoting *Bin Laden*, 92 F.Supp.2d at 209).

The 1790 Act remained essentially unchanged until 1909, when Congress undertook a comprehensive codification of the criminal code. For the first time, the section defining jurisdiction was codified in a separate statute, but again, this precursor

to § 7(3) applied only to lands over which the United States had "exclusive" jurisdiction. *See* Act of March 4, 1909, ch. 321 § 272, 35 Stat. 1143 (1909) ("When committed within or on any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dock-yard, or other needful building."). Congress could not have intended this provision to apply to property in foreign countries. Congress knew how to extend criminal jurisdiction when it wanted to,[13] and its failure to do so in 1909 is telling.

It was not until 1940 that Congress expanded the statutory scope to include land over which the federal government had "concurrent" jurisdiction. *See* Act of June 11, 1940, ch. 323, 54 Stat. 304 (1940) ("When committed within or on any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.").

The legislative history of the 1940 amendment indicates that Congress did not intend to expand the scope of federal criminal jurisdiction by adding "concurrent," and surely not to foreign lands. Rather, according to the legislative history, Congress intended to respond to a 1937 Supreme Court decision that held that states consensually transferring lands to

the United States may retain partial or concurrent jurisdiction:

Prior to the decision of the Supreme Court in *James v. Dravo Contracting Company* (302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155) (December 1937), it was the accepted view that the United States acquired exclusive jurisdiction over any lands purchased with the consent of the State for any of the purposes enumerated in article I, section 8, clause 17, of the Constitution, and that any provision of a State statute retaining partial or concurrent jurisdiction was inoperable. In the *Dravo* case it was held that a State may properly retain partial or concurrent jurisdiction.

The provisions of the Criminal Code ... limited the criminal jurisdiction of the Federal Government to such Federal reservations in respect to which the United States had acquired exclusive jurisdiction.

This bill simply restores to the Federal Government the jurisdiction it was recognized as having until the *Dravo* decision was handed down.

The most significant effect of this bill is to grant Federal courts concurrent criminal jurisdiction on reservations where the United States does not have exclusive jurisdiction.

H.R.Rep. No. 76-1623, at 1 (1940); *see also Gallin*, 216 F.3d at 219-20 n. 14 ("Notwithstanding this change, it is apparent from what little legislative history there is of the 1940 Act ... that, in making this change, the 76th Congress did not intend to extend the reach of the statute to lands outside the United States."); *Bin Laden*, 92 F.Supp.2d at 210-11 & n. 37. In other words, Congress intended the addi-

---

**13.** For example, Congress did not presume that "Indian country" fell within the sole and exclusive jurisdiction of the United States, but rather explicitly provided that "the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States ... shall extend to the Indian country." *Ex parte Crow Dog*, 109 U.S. 556, 558, 3 S.Ct. 396, 27 L.Ed. 1030 (1883) (quoting 28 Rev. Stat. ch. 4, § 2145). Further, the Su-

preme Court recognized the need for Congress to be explicit when providing for federal jurisdiction over Indian reservations falling outside the Western territories: "If the land reserved for the exclusive occupancy of Indians lies outside the exterior boundaries of any organized Territorial government [including by treaty], it would require an act of Congress to attach it to a judicial district...." *Id.* at 559, 3 S.Ct. 396.

tion of "concurrent" to address the issue of a *state's* concurrent jurisdiction.

The addition of "concurrent" in 1940, without any contemporary indication that the change was brought about by a desire to include locations in foreign countries, undermines the majority's reliance on the statute's reference to "concurrent" jurisdiction. I cannot agree with the majority's unsupported assertion that there is no reason "to presume that when, in 1940, Congress extended criminal jurisdiction to those lands under the concurrent authority of the United States, it intended to limit the reach of subsection 7(3) to areas under the concurrent authority of the states, but not those under the concurrent authority of other sovereigns." Maj. Op. at 1175. Although the presumption against extra-territoriality applies to this statute, we do not need to presume anything here—an examination of the statute and its history indicates that § 7(3) does not extend to lands abroad. The majority's quantum leap from the statute's long-standing reference to "exclusive" jurisdiction to assertion of jurisdiction over crimes in foreign countries cannot be sustained.

The legislative history points to one conclusion: § 7(3) applies only in the domestic context, not to federal criminal jurisdiction beyond our borders.

## IV. RESORT TO HISTORY

The majority's effort to find support through reference to the history of our nation's westward expansion and overseas acquisitions in no way informs the question here. Rather the history demonstrates simply that Congress knew how to extend explicitly the reach of the federal criminal code when it so desired. I am not persuaded by the majority's attempts to locate in the general history of our country's nineteenth century expansion evidence of

an intent that a provision, which at the time covered only lands over which the United States had "exclusive" jurisdiction, would apply to places undoubtedly located in foreign countries.

The majority begins with the statement that, at the turn of the century (when the precursor to § 7(3) spoke only of lands over which the U.S. had "exclusive" jurisdiction), Americans "may have believed that, so long as territory remained unequivocally foreign, it lay outside the jurisdiction of the United States, [but] they were well aware that territory could change hands, and the United States could gain exclusive jurisdiction over territory that other countries claimed as their own." Maj. Op. at 1173. Indeed, as the majority points out, the turn of the century marked a period of great expansion in our nation's history, which suggests that "[t]his was clearly not a time when Americans thought of their borders as static or of foreign territory as sacrosanct." *Id.* at 1173. True enough, but, at risk of being perceived as glib, I ask, so what? Neither was this a time when Americans viewed themselves as having exclusive jurisdiction over land clearly within the territorial boundaries of a foreign sovereign.

This historical digression does not advance our inquiry, for we are dealing here with embassy housing and a military base, not lands that became part of our country through annexation, purchase or conquest, and as such fell within our exclusive jurisdiction. Nor are we dealing with land over which United States sovereignty or jurisdiction is disputed. *See* Maj. Op. at 1175 ("Courts had no hesitation about treating these territories as within our exclusive jurisdiction, even though foreign governments claimed the territory as their own.").[14] The natural application of § 7(3)'s precursors to such lands does not

---

14. The majority's discussion of *Watts v. United States*, 1 Wash. Terr. 288 (Wash.Terr.1870), is incomplete. *See* Maj. Op. at 1174–75. The statute at issue in that case was the precursor to § 7(3) created by the 1790 Act. *See* 1790 Act, ch. 9, § 3, 1 Stat. 113. The court in *Watts* first concluded that, despite a conflict

between the U.S. and Great Britain, because the U.S. "claims San Juan Island, we must treat it as under the general laws of the United States . . . ." *Watts*, 1 Wash. Terr. at 296. The court, however, went on to find that, "in order that the crime of which the defendant is charged should be within the jurisdiction of

suggest, let alone conclusively determine, that Congress expected property used by the United States but located squarely and unequivocally within foreign borders[15] to fall within our "exclusive" jurisdiction.[16]

The discussion of legislation extending federal criminal jurisdiction to territory under Indian control and islands claimed by Americans for their guano deposits also fails to provide support for the majority's decision. *See* Maj. Op. at 1174–75.[17] Rather, these acts further demonstrate that when it so desires, Congress knows how to make explicit its intent to include lands within the reach of the federal crimi-

nal code. In fact, the majority underscores this conclusion by observing that "[w]hen the United States claimed territory far beyond its borders, Congress promptly extended federal jurisdiction to those areas under U.S. control." Maj. Op. at 1175. Nor is the majority's recognition that Congress "understood criminal jurisdiction to extend to all lands claimed by the United States, without regard to whether they were within a particular state or even within the continental United States," Maj. Op. at 1175, helpful, because the locations at issue here are not "lands claimed by the United States."

the Court below, *it was not only necessary that it be committed within the United States, but in a place within the 'sole and exclusive jurisdiction of the United States.' This phrase 'sole and exclusive' means exclusive of any. other domestic jurisdiction, and has no reference to foreign authority."* *Id.* (emphasis added). The court then held that the U.S. did not have sole and exclusive jurisdiction. *Id.* at 299.

*Watts* suggests that determining whether criminal jurisdiction exists involves a two-part inquiry, namely: (1) whether the land was within the U.S. and, if so, (2) whether the U.S. had sole and exclusive jurisdiction over that land. *See also id.* at 301 (Jacobs, C.J., dissenting) ("We all agree that the phrase 'sole and exclusive jurisdiction' as used in the [act] has no reference to a claim of jurisdiction made by any foreign power, but to state and federal jurisdiction, or as we are situated, to federal as contradistinguished from Territorial jurisdiction."). The implication of this reasoning is that the "exclusive or concurrent" language of § 7(3) as it reads today similarly pertains to the federal government vis a vis the states.

The majority's reliance on *Jones v. United States*, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691 (1890), is also misplaced. *See* Maj. Op. at 1174–75. That case involved an island containing guano deposits over which the U.S. had exclusive jurisdiction, *see id.* at 217, 11 S.Ct. 80, and to which Congress expressly extended federal criminal laws, *see id.* at 211–12, 11 S.Ct. 80. There was no question in that case that Congress intended to bring the island at issue within the scope of federal criminal jurisdiction, although there was a question regarding Haiti's challenge to U.S. sovereignty over the island. *See id.* at 219–24, 11 S.Ct. 80.

**15.** *See United States v. Spelar*, 338 U.S. 217, 219, 70 S.Ct. 10, 94 L.Ed. 3 (1949) (holding that "claims arising in a foreign country"

exclusion in Federal Tort Claims Act applies to a leased U.S. airbase in Newfoundland because the base remained subject to the sovereignty of Great Britain and therefore lay within a "foreign country").

**16.** The majority's recognition that the "original 1790 Act provided basic criminal laws for lands outside the jurisdiction of any other sovereign," Maj. Op. at 1173, carries little weight here, for neither of these locations is "outside the jurisdiction of any other sovereign." Although embassy officials may be immune from prosecution in the host state, that does not imply that the host state does not have jurisdiction over the embassy. *See* Restatement (Third) of the Foreign Relations Law of the United States § 466 cmt. a (1986) ("That [embassy] premises are inviolable does not mean that they are extraterritorial. Acts committed on those premises are within the territorial jurisdiction of the receiving state...."). Similarly, under the U.S.—Japan SOFA, the two countries have concurrent jurisdiction over criminal acts committed on military bases in Japan (presuming the acts are in fact criminal under the laws of both countries). *See* SOFA, art. XVII. In light of this situation, the government's alternative argument—that jurisdiction lies under § 7(7), which provides that the special maritime and territorial jurisdiction also includes "Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States," is misplaced.

**17.** The guano islands are more akin to newly discovered, previously unclaimed territory over which the United States may assert exclusive jurisdiction, *see Jones v. United States*, 137 U.S. at 212, 11 S.Ct. 80, than to U.S. embassy housing and military bases located within the borders of a foreign nation.

The history of our westward expansion, while interesting, is far afield from congressional intent in 1790 or remedial legislation adopted in 1940. To the extent we look beyond the statute, I find the legislative history far more instructive and compelling.

## V. LEASED HOUSING AND MILITARY BASES

Because I conclude that § 7(3) does not extend the reach of 18 U.S.C. §§ 2241(a) and 2242(1) extraterritorially, it is unnecessary to consider whether the United States exercises "exclusive or concurrent" jurisdiction over the leased housing or military base in this case. Nonetheless, some discussion of the nature of these locations is useful, as it illustrates the far-reaching consequences of the majority opinion and the tremendous conflict it creates with the long-held understanding of the Supreme Court, Congress, the military, and the commentators.

### A. Leased Housing

Bearing in mind that § 7(3) was intended at the outset to extend only to lands under the exclusive control of the United States, an apartment leased by the United States in a foreign country is both legally and conceptually far afield from that category. The United States is not an infrequent tenant abroad. Under the majority's approach, criminal jurisdiction would extend to more than 10,000 properties leased by the United States in foreign countries, ranging from Australia to the Vatican City, and not including extensive property leased by defense agencies. *See* United States Gen. Servs. Admin., Summary Report on Real Property Leased by the United States Throughout the World as of September 30, 1999, at 13 (1999). Absent congressional directive, we should not treat lightly such a far flung extension of criminal jurisdiction.

### B. Military Bases and the Jurisdictional Gap

Jurisdiction over civilians accompanying the military abroad presents a special case. The United States typically negotiates this jurisdiction with other countries via Status of Forces Agreements ("SOFAs"). *See* Steven J. Lepper, *A Primer on Foreign Criminal Jurisdiction*, 37 A.F. L.Rev. 169, 171 (1994) ("Today, it is widely agreed that in the absence of a treaty like SOFA, jurisdiction over foreign forces rests exclusively with the host state.").[18] The 1960 U.S.—Japan SOFA follows the standard format,[19] giving Japan the exclusive power to prosecute American civilians like Corey when their offenses are not punishable under the laws of the United States.[20]

**18.** *See generally 1 Oppenheim's International Law* § 558, at 1157 (Robert Jennings & Arthur Watts eds., 9th ed. 1992) ("The view, formerly widely held, that the force was in all respects to be regarded as beyond the jurisdiction of the territorial state ... and subject only to that of its own authorities can no longer be maintained. The fiction of extraterritoriality has in this area, as in others, been discarded.") (footnote omitted).

**19.** Article XVII provides:
   1. Subject to the provisions of this Article,
   (a) the military authorities of the United States shall have the right to exercise within Japan all criminal and disciplinary jurisdiction conferred on them by the law of the United States over all persons subject to the military law of the United States;
   (b) the authorities of Japan shall have jurisdiction over the members of the United States armed forces, the civilian component, and their dependants with respect to

offenses committed within the territory of Japan and punishable by the law of Japan.
   A complete reading of the SOFA suggests that the land remained Japanese territory. *See, e.g.,* Art. XXIII ("The Government of Japan agrees to seek such legislation and to take such other action as may be necessary to ensure the adequate security and protection *within its territory* of installations, equipment, property, records and official information of the United States, and for the punishment of offenders under the applicable laws of Japan.") (emphasis added).

**20.** Article XVII § 2(b) provides for Japan's jurisdiction over dependents of the U.S. military in Japan for offenses punishable under the law of Japan by not under the law of the U.S.; "The authorities of Japan shall have the right to exercise exclusive jurisdiction over members of the United States armed forces, the civilian component, and their dependants with respect to offenses ... punishable by its law but not by the law of the United States."

Until the Supreme Court's ruling in *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), it was generally presumed that United States military courts had jurisdiction over civilians accompanying the military who committed crimes abroad. *See Gatlin,* 216 F.3d at 220 n. 15; Lepper, 37 A.F. L.Rev. at 171. In *Reid,* however, the Supreme Court held to the contrary, concluding that the exercise of jurisdiction over a civilian dependent in a capital case during peacetime was unconstitutional. *See Reid,* 354 U.S. at 40–41, 77 S.Ct. 1222. In so holding, the Court created a "jurisdictional gap" with respect to civilians accompanying the military abroad. *See* Gregory A. McClelland, *The Problem of Jurisdiction Over Civilians Accompanying the Forces Overseas–Still With Us,* 117 Mil. L. Rev. 153, 173–74 (1987).

Although the Court was not addressing § 7(3), *Reid* suggests that the Court was aware of the jurisdictional gap issue. For example, Justice Frankfurter noted that the government argued that an adverse decision meant that "only a foreign trial could be had." 354 U.S. at 48, 77 S.Ct. 1222 (Frankfurter, J., concurring). Similarly, Justice Clark recognized that "[t]he only alternative remaining—probably the alternative that the Congress will now be forced to choose—is that Americans committing offenses on foreign soil be tried by the courts of the country in which the offense is committed." *Id.* at 88, 77 S.Ct. 1222 (Clark, J., dissenting).

Three years after *Reid,* in *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), the dilemma of the jurisdictional gap again surfaced. With respect to civilians accompanying the military outside the United States, the Court pointed to "the want of legislation providing for trials in capital cases in Article III courts sitting in the United States," noting that, "[a]t argument, the Government indicated that there had been no effort in the Congress to make any provision for the prosecution of such cases either in continental United States or in foreign lands." *Id.* at 245, 80 S.Ct. 297. Justice Whittaker agreed that "jurisdiction of our civil courts does not extend" to "bases in foreign lands." *Id.* at 276, 80 S.Ct. 297 (Whittaker, J., concurring in part and dissenting in part). Finally, Justice Harlan, in dissent, wrote that the Court's decisions "are ... regrettable because they are bound to disturb delicate arrangements with many foreign countries, and may result in our having to relinquish to other nations ... a substantial part of the jurisdiction now retained over American personnel under the Status of Forces Agreements." *Id.* at 259, 80 S.Ct. 297 (Harlan, J., dissenting).

The majority gives short shrift to the conclusion that such a jurisdictional gap exists. *See* Maj. Op. at 1172 n. 3. But Congress recently passed legislation specifically to close the gap. *See* Military Extraterritorial Jurisdiction Act of 2000, S. 768, 106th Cong. (2000). I view the recent legislation as confirmatory "icing on the cake" and not, as the majority suggests, evidence of congressional intent in 1790. The gap is not illusory. Prior to this new legislation, Congress made numerous efforts to enact legislation to fill the gap. *See Gatlin,* 216 F.3d at 222 n. 23 (documenting multiple failed congressional attempts to close gap); Susan S. Gibson, *Lack of Extraterritorial Jurisdiction Over Civilians: A New Look at an Old Problem,* 148 Mil. L.Rev. 114, 136–37 (1995); Thomas G. Becker, *Justice on the Far Side of the World: The Continuing Problem of Misconduct by Civilians Accompanying the Armed Forces in Foreign Countries,* 18 Hastings Int'l & Comp. L. Rev. 277, 287 (1995) (discussing recent proposals to make conduct that would be punishable if committed within the special maritime and territorial jurisdiction also punishable if committed by civilians accompanying the armed forces overseas); Robinson O. Everett and Laurent R. Hourcle, *Crime Without Punishment–Ex–Servicemen, Civilian Employees and Dependants,* 13 U.S.A.F.J.A.G. L. Rev. 184 (1971) (discussing § 7(3) at length); McClelland, *supra* at 199–200 (discussing

proposals to expand § 7(3) during the 1980s that would have covered crimes committed "within a United States military installation abroad"). Although this new legislation does not apply to Corey, it certainly confirms the existence of the gap in this case—and, by implication, the conclusion that § 7(3) does *not* fill the gap. Moreover, the military has also recognized the existence of this jurisdictional gap. *See* Department of Defense Overseas Jurisdiction Advisory Committee, Report of the Advisory Committee on Criminal Law Jurisdiction Over Civilians Accompanying the Armed Forces in Time of Armed Conflict 41 (1997) ("Installations in foreign countries are not currently within the special maritime and territorial jurisdiction of the United States.").[21]

My conclusion that a jurisdictional gap exists—and that § 7(3) does not fill it—is consistent with the consensus among the Supreme Court, Congress, the military, and commentators. I agree with the Second Circuit that "the existence of this jurisdictional gap is an issue that … warrants serious congressional consideration." *Gatlin,* 216 F.3d at 209. But because Congress chose not to address this problem in § 7(3), we are without jurisdiction over Corey.

## VI. CONCLUSION

Regardless of whether we see this as a problem that requires fixing, it is a problem that the federal courts are without power to fix. Simply put, the onus is not on the courts to provide for jurisdiction in this case. Congress has the power under both the Constitution and international law to extend the reach of our criminal laws beyond the borders of the United States. The question is not whether jurisdiction should extend extraterritorially, but whether, under this statute, Congress in fact extended the jurisdiction. The an-swer here is no. Therefore, I respectfully dissent.

---

**21.** The majority dismisses the views of the military as well as those of academics regarding the "jurisdictional gap." *See* Maj. Op. at ——. Although I am well aware that these views are not entitled to special deference, I also recognize that the military has a particular interest in this issue, and its conclusion that a gap exists is noteworthy.